**STATE of Tennessee, Appellee,**

v.

**Antonio Erasmo ALVARADO, Appellant.**

Court of Criminal Appeals of Tennessee,
at Nashville.

Nov. 27, 1996.

Permission to Appeal
Denied by Supreme Court Oct. 6, 1997.

Jan R. Patterson (on Appeal), Jackson, John Dickey, District Public Defender, Robert Marlow, Curtis Gann, Assistant Public Defenders, Fayetteville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Charlotte H. Rappuhn, Assistant Attorney General Criminal Justice Division, Nashville, W. Michael McCown, District Attorney General, Robert G. Crigler, Gary M. Jones, Asst. District Attorneys General, Shelbyville, for Appellee.

## OPINION

WADE, Judge.

The defendant, Antonio Erasmo Alvarado, was convicted of attempted felony murder, aggravated assault, aggravated rape and aggravated burglary. The jury acquitted the defendant of the charge of theft of property. The trial court imposed a Range I, effective sentence of fifty (50) years and approved fines totaling $70,000. The specific sentences and fines were as follows: [1]

| Count | Offense | Sentence |
|---|---|---|
| One | Attempted Felony Murder | 23 years Consecutive to Counts 5 & 7 Class A Felony |
| Three | Aggravated Assault | 3 years Concurrent with Count 1 Fine—$10,000 Class C Felony |
| Five | Aggravated Rape | 21 years Consecutive to Counts 1 & 7 Fine—$50,000 Class A Felony |
| Seven | Aggravated Burglary | 6 years Consecutive to Counts 1 & 5 Fine—$10,000 Class C Felony |

The defendant presents the following issues for review:

(1) whether attempted felony murder is a statutory offense;

(2) whether the multiple convictions violated double jeopardy and due process principles;

(3) whether the jury instructions by the trial court misstated the relevant law;

(4) whether the trial court erred by imposing excessive sentences and fines;

(5) whether the trial court erroneously admitted into evidence a pretrial statement of the defendant;

(6) whether the trial court erred by denying the defendant a trial transcript in order to prepare for a motion for a new trial.

We reverse and dismiss the conviction of attempted felony murder; otherwise, we affirm.

On November 13, 1993, TC,[2] the fourteen-year-old victim, was discovered in her friend's apartment with 67 stab wounds on various parts of her body. At the subsequent trial of the defendant, the victim testified that on the afternoon before the stabbing, she went to Laura White Rez's apartment to babysit an eight-month-old child. During the course of the evening, the victim had locked the storm door; at about 11:00 P.M., she had opened the main door due to the heat in the apartment. About thirty minutes later, the defendant, wearing dark trousers, a gray sweatshirt which was covered by a sleeveless shirt with a car print, a red and black vest, and a dark baseball cap with the letters "mpulse," jerked open the storm door. The victim testified that the defendant, carrying two bottles of beer, struck the victim in the right eye, knocking her to the floor. The defendant then knelt over her, placed a pocketknife to her neck, and ordered the victim to take her pants off. When she refused, the defendant then tried to stab the victim in the back of the neck. When the victim resisted, the defendant stabbed her left hand and arm approximately seventeen times. At the conclusion of this assault, the victim went to the bathroom, cleaned her stab wounds, and wrapped a towel around her hand. Still carrying the

---

1. The state presented alternative theories to the jury. For sentencing purposes, the trial court ruled that some counts merged into the other convictions. Count 2 of the indictment charged attempted first degree murder. The jury returned a guilty verdict of attempted second degree murder and a fine of $25,000; the trial court decided that the count merged into the conviction for attempted felony murder. The verdict of guilt for aggravated rape under Count

6 was merged into Count 5. Count 4 was an alternative theory for aggravated assault based on serious bodily. Counts 2, 4 and 6 were dismissed upon motion by the state.

2. It is the policy of this court to withhold the identity of minors involved in sexual abuse. *State v. Schimpf,* 782 S.W.2d 186, 188 n. 1 (Tenn. Crim.App.1989).

knife, the defendant directed the victim to hurry back to the couch where he directed her to take off her pants and underwear. While holding the knife at the victim's throat, the defendant vaginally penetrated the victim. As he did so, he bit her breasts, causing bruises.

After the sexual assault, the defendant refused to allow the victim to put on her clothes until he finished his beer. Five to ten minutes later, the defendant began to throw toys at the victim, directing her to place both the toys and several videos into a pillow case. The defendant then ordered the victim to an exterior back porch. They remained there for about ten to fifteen minutes until they saw someone from a nearby apartment. When they went back inside the Rez apartment, the defendant, repeatedly saying he wanted to kill her, attempted to suffocate the victim with the towel she had used as a bandage. The victim, who was able to momentarily push the defendant away, grabbed a kitchen knife and tried to stab the defendant; the defendant, however, was able to disarm her. When the victim tried to escape through the front door, the defendant stabbed her approximately 50 more times. The victim attempted to resist by biting the defendant's hands.

Afterward, the defendant stated that he was leaving and threatened to kill the victim and her family if she tried to get help. The victim locked the door, was able to push the redial button on the telephone, and when connected with Sarah Merlo, asked her to send an ambulance to the Rez apartment. Later, the victim described the defendant to police as a Hispanic male with black, curly hair and a moustache. She was able to pick the defendant out of a photographic lineup and positively identified him at trial. The victim testified that the defendant spoke to her in English throughout the attack.

The victim was hospitalized for three days and required surgery to stitch her wounds. She has knife scars on her arms, legs, stomach, back, face, throat and ear.

Sarah Merlo testified that she received a phone call from the victim in the early morning hours of November 14. Ms. Merlo called 911.

Laura White Rez testified that the victim was babysitting her eight-month-old child while she and her fiance went to a movie. The victim had cared for the two Rez children approximately fifteen to twenty times prior to the offense. Ms. Rez testified that the defendant resided with his girlfriend, Janice Nunez, who lived in a nearby, upstairs apartment. Ms. Rez, who had never seen the victim speak to the defendant, returned to her apartment sometime after the assault, discovering that one of her pillowcases and some of her children's toys and movies were missing.

David C. Adams, a police officer for the Shelbyville Police Department, was the first to arrive at the crime scene. He began going door to door at the apartments in an attempt to find the victim. When he arrived at the Nunez apartment, he called to Ms. Nunez and noticed the defendant, a Hispanic male, inside the apartment. The defendant wore no shirt.

When Officer Adams arrived at the Rez apartment, he opened the unlocked door and found the victim covered with blood. She was lying face down in the living room. The apartment was in disarray. The victim's first words were, "Get the baby." Although she expressed fear about identifying her assailant because he had threatened to kill her and her family, the victim nonetheless provided his description and suggested that he was somehow connected to the upstairs apartment.

Officer Adams and Officers Barber and Clanton returned to the Nunez apartment to further investigate. The defendant, still without a shirt, was sitting on the couch holding a baby. The officers found a sleeveless, red and black flannel vest lying on a bed and a plastic bag of blood-stained clothing in a garbage can on the back porch; the bag contained a t-shirt with an imprint of a '57 Chevy and a white "Bart Simpson" sweatshirt. At that point, Officer Adams advised the defendant of his *Miranda* rights.

A search of the Rez apartment yielded a black baseball cap with the writing "Interpol" lying "very near" where the victim was discovered. Two beer bottles were found

near the couch; three other beer bottles, fully empty or broken, were found closer to the bedroom.

Sergeant Harold B. McKee of the Shelbyville Police also investigated the crime and questioned the defendant prior to any *Miranda* warnings. He testified that when he asked the defendant "how long he [was] downstairs with the victim," the defendant responded, "About an hour and a half."

Officer Don Barber, a Shelbyville police officer, sketched the apartment where the victim was found. His diagram depicted blood stains near the kitchen and bathroom sinks.

Robert Carstens, an emergency paramedic at Bedford County Emergency Medical Service, responded to the 911 call. Upon his arrival, he found the victim on her back in a pool of blood. Carstens testified that he thought she was dead. He described the victim as "bleeding profusely" from, by his count, 52 stab wounds. She had gone into shock due to excessive blood loss.

Pedro Galvez, an emergency room doctor at Bedford County Hospital, examined the victim and found 67 stab wounds. He described the wounds as life-threatening because she had lost a substantial amount of blood. The number of wounds required suturing under general anesthesia. Dr. Galvez testified that he did not request a blood sample of the victim for blood and alcohol testing because she did not appear to be under the influence. He observed bruises, abrasions and swelling of the victim's vaginal area as he performed a rape kit examination.

Margaret Hargrove, a registered nurse who works in the emergency room at Bedford County Hospital, assisted in the preparation of the rape kit; she included samples from both the victim and the defendant. Nurse Hargrove testified that she noticed bruises around the victim's pubic area and counted 67 stab wounds. Several other medical personnel testified that they took samples from the victim and the defendant and also from Jose Canizalez, a cousin to the defendant.

Anticipating the claims of the defense, the state called Brenda Lee Sizemore, the office manager where both the defendant and Canizalez worked. She testified that the defendant had not reported any work-related injuries (such as hand cuts); she had not noticed him to have any injuries prior to the assault. Ms. Sizemore acknowledged that the defendant always spoke to her in English but confirmed that he did not speak the language as well as Canizalez.

Rodney Rochelle Russell, a co-worker of the defendant, testified that he and the defendant always spoke to each other in English. He remembered the defendant telling him on the night before the assault that he was "going to go out and get drunk and get him some pussy" to celebrate his birthday. Russell believed that the defendant spoke English better than Canizalez.

Janice Nunez, the defendant's girlfriend, testifying for the state, said that the defendant was living with her when the incident occurred. She informed the police that the defendant came home around 10:30 P.M. and told her that he was going out. She testified that she had no knowledge of whether the defendant actually left the apartment but did recall the back door being opened. She heard a noise from the downstairs, Rez apartment at around 1:15 A.M. when she answered the door for the brother of Canizalez's girlfriend; to her knowledge, the defendant was not in the apartment at the time. Ms. Nunez testified that she telephoned a friend after hearing the noise; she was on the phone fifteen minutes later when the defendant returned. He told her conflicting stories about his whereabouts: that he had just come home in Canizalez's car; that he had walked home from the store; and that he had been in a fight. Ms. Nunez became upset with the defendant and told him to leave. She remembered the defendant taking his shirt off but did not remember whether he changed pants. The defendant then got a plastic grocery bag from the kitchen and put some clothes in it. When the police knocked at her apartment door, the defendant stepped outside and came back inside momentarily. Sometime after the police left, at about 2:00 A.M., Canizalez knocked on the door and entered the apartment; he left after about two minutes.

Ms. Nunez identified the cap found near the victim as belonging to the defendant; she recognized the sweatshirt discovered by the police as her own. She acknowledged that the defendant and Canizalez often wore each other's clothing and that Canizalez had changed clothes in her apartment before. She claimed Canizalez also owned a pair of black pants and wore a camouflage jacket. Ms. Nunez remembered seeing Canizalez's car parked in the apartment lot on the night of the offense. Since the crime, the defendant had told Ms. Nunez that he would not be in this trouble if he had been able to have sex with her. She stated that she had never seen the victim speak to either the defendant or Canizalez.

Detective Cris Szarolita of the Shelbyville Police Department testified that the Rez apartment was in disarray just after the offense. Later, he noticed two cuts on the defendant's left hand.

Detective Dale Elliott of the Shelbyville Police asked Canizalez to submit to a rape kit examination. He also assembled the photographic lineup. He testified that the victim positively identified the defendant without any hesitation. He conceded that the photographic lineup did not contain a picture of Canizalez. Detective Elliot testified that the victim had claimed that her assailant was a complete stranger.

Raymond A. Depriest, a TBI forensic scientist specializing in serology, examined the rape kits. He testified that the victim had been involved in sexual intercourse and that the results excluded Canizalez as a possible participant. He acknowledged that there was a possibility that more than one person could have contributed semen because Canizalez's blood type was the same as the victim's and could have been masked. He testified that DNA testing would conclusively determine whether Canizalez had sex with the victim. Agent Depriest testified that blood stains on the hat and camouflage jacket could have been either that of Canizalez or the victim, but not the defendant. The blood on the t-shirt, the black jeans, the black sweatpants, the camouflage jacket and the sweatshirt was consistent with that of the victim, but not that of Canizalez or the defendant. Depriest saw the underwear of the defendant and testified that he believed that semen and blood stains appeared to be present. An examination established that the defendant's left shoe had blood on it. One of the beer bottles also had a human blood stain.

On cross-examination, Special Agent Depriest acknowledged that there was no method to determine the age of a blood or semen stain. He stated that it was possible that blood from the victim had been transferred to the hat while she was lying in the floor. He also said that the blood could have been transferred to the hat if the wearer was bleeding from the hand and touched the hat. Testing of the hat established that the blood could not have come from the defendant.

Margaret Bash, a TBI forensic scientist specializing in DNA analysis, examined vaginal swabs and the underwear of the victim. When she compared them to samples taken from the defendant and Canizalez, the analysis excluded Canizalez as a contributor of sperm. It was her opinion that the defendant was the perpetrator. She stated that the chance of misidentification was approximately one in twenty-six (26) million for the panties and one in twenty-one (21) million for the vaginal swabs. Her DNA testing of blood on the t-shirt found in the possession of the defendant revealed a match of the victim's blood; there was only a one out of twenty-nine (29) million chance of misidentification. Special Agent Bash conceded that DNA testing did not reflect how long a semen or blood stain had been on an article.

The defendant did not testify. He had been provided an interpreter to translate the proceedings.

Perry Michael Stubblefield, a resident at South Gate Apartments who lived two apartments away from Laura White Rez, testified for the defense. He stated that when he and his girlfriend returned to his apartment at approximately 10:45 P.M., he saw a girl he had never seen before standing at the driver's side of a cream-colored car parked in the space for Rez's apartment. Stubblefield related that he did not know the defendant or Canizalez personally but had seen them at

the apartments. On cross-examination, he acknowledged that it was dark at the time and the girl he saw could have had either blonde or light-brown hair.

Judith Irene Canady, the girlfriend of Perry Stubblefield, testified that the girl standing beside the car was the victim. Ms. Canady, who stated that she was positive about her identification, described the person in the car as a dark-headed man wearing a light-colored, short-sleeved t-shirt.

Bradley Allen McTigue, who lived at South Gate Apartments, testified that when he arrived home at approximately 11:15 P.M., he saw the defendant standing outside on the steps drinking a can of beer. He was wearing a short-sleeved shirt.

On rebuttal, the state called Jose Canizalez as a witness. He testified that he drove a brown car and was at South Gate Apartments on November 12 and 13, 1993. Tracy Conner, his blond-haired girlfriend, was with him at the time.

I

■ The defendant first contends that his conviction for attempted felony murder should be reversed because the offense is not a crime recognized by Tennessee law. We must agree.

The state submitted alternative theories on attempted first-degree murder to the jury, and the jury returned a verdict of guilt for attempted felony murder and attempted second degree murder. At the sentencing hearing, the state agreed that the conviction of attempted second degree murder and a fine of $25,000 would merge into the conviction of attempted felony murder.

Our supreme court, however, recently ruled that an attempt to commit felony murder is not a crime in Tennessee. *State v. Kimbrough*, 924 S.W.2d 888 (Tenn.1996). "'Although murder may be committed without an intent to kill, attempt to commit murder requires a specific intent to kill.'" *Id.*, at 891 (quoting *Braxton v. United States*, 500 U.S. 344, 351, 111 S.Ct. 1854, 1859, 114 L.Ed.2d 385 (1991)). The court ruled that "a charge of 'attempted felony-murder' is inherently inconsistent, in that it requires that the

actor have intended to commit what is deemed an unintentional act." *Id.*, at 890. Thus, it reasoned, "it is logically and legally impossible to attempt to perpetrate an unintentional killing." *Id.*, at 892. The conviction for attempt to commit felony murder must, therefore, be reversed and the charge must be dismissed.

■ We now turn to the issue of whether the guilty verdict for attempted second degree felony murder stands. Ironically, the trial judge made the following comment during jury deliberations: "it will be an interesting law school question if they come back and find him guilty of attempted second degree murder and attempted felony murder." The trial court resolved the question by merging the attempted second degree murder and the attempted felony murder and entering an order granting the state's motion to dismiss the premeditated murder count, the count which resulted in the attempted second degree murder conviction.

In *State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim.App.1993), this court attempted to ascertain the proper procedure for preventing "a total dismissal in the event [the defendant is] successful on appeal of the conviction for the greater offense." *Id.* (citing *State v. Davis*, 613 S.W.2d 218 (Tenn.1981)). To avoid a complete dismissal, this court ruled that the trial court "should enter a judgment of conviction on the greater offense and a judgment merging the lesser offense into the greater." *Id.* Although the trial court failed to implement that procedure, we are nonetheless tempted to restore the verdict for attempted second degree murder. The defendant had a trial and the jury returned a verdict of guilt, clearly one based upon sufficient evidence. This situation, however, is indistinguishable from the holdings in *Banes* and *Davis*. The trial court entered a judgment for attempted felony murder; the judgment did not, however, reflect that the guilty verdict for attempted second-degree murder had been merged into the collateral conviction. In fact, the trial judge suggested a dismissal of the latter charge. The state complied. A separate judgment was not entered into the record. Because, instead, the state had asked to dismiss the part of the

indictment for which the attempted second degree murder conviction was returned, a motion which was sustained by the trial court, there is simply no conviction left to reinstate.

This court has no authority to reinstate unless the trial judge has validated the verdict by approval in the role of thirteenth juror. Absent that, the verdict is invalid. *Davis*, 613 S.W.2d at 221. We note, however, that the action by the trial court does not appear to preclude a retrial for the defendant on an attempted second degree murder charge. *Id.* Our interpretation of *Davis* is that the state may seek a re-indictment and, if successful, put the defendant to trial.

## II

The defendant next argues that there was no clear break in the chain of events between the offenses sufficient to support separate convictions. He further claims that the trial court erred by refusing to merge his convictions for attempted felony murder and aggravated assault into the aggravated rape conviction, thus violating double jeopardy principles. Because the conviction for attempted felony murder must be reversed and by the action in the trial court, the conviction for second degree murder no longer stands, we will not address the due process and double jeopardy issues as they relate to this conviction. We will, however, consider the challenge to the aggravated assault conviction.

The defendant relies on *State v. Anthony*, 817 S.W.2d 299 (Tenn.1991), for his assertion that his due process rights were violated by the imposition of separate convictions. His argument, however, relies primarily upon double jeopardy grounds.

In our view, due process principles set forth in *Anthony* are not applicable. In *Anthony*, our supreme court addressed the issue of whether dual convictions of armed robbery and aggravated kidnapping violated the due process guarantees of Art. I, § 8 of the Tennessee Constitution. This court, however, has rejected attempts to interpret

*Anthony* as meaning that the state should be prohibited from obtaining convictions for separate offenses which are committed in the same criminal episode and for which each offense requires proof that the victim suffered serious bodily injury. *See State v. Frank B. Jackson, Jr. & Robert Joe Randolph*, No. 03C01–9206–CR–00222, 1993 WL 285949 (Tenn.Crim.App., at Knoxville, July 29, 1993), *perm. to app. denied* (Tenn.1993). In *State v. Oller*, 851 S.W.2d 841, 842–43 (Tenn.Crim.App.1992), where the defendant was convicted of especially aggravated burglary, especially aggravated robbery, and first degree murder, this court found that "proving the elements of any of the alleged offenses, would not inherently or necessarily prove the elements of either of the other two offenses."[3] That is also the case here.

The double jeopardy clauses of the United States and Tennessee Constitutions protect against multiple convictions or punishments for the same offense. Multiple convictions for the same offense cannot stand unless the offenses supporting the convictions are "wholly separate and distinct." *State v. Goins*, 705 S.W.2d 648, 650 (Tenn. 1986); *State v. Pelayo*, 881 S.W.2d 7, 10 (Tenn.Crim.App.1994). Double jeopardy principles require an analysis of the following factors in order to determine whether separate convictions can be upheld for offenses occurring in a related transaction:

(1) whether the event is a violation of two distinct statutory provisions,

(2) whether either offense is necessarily included in the other,

(3) whether the offenses require proof of different elements,

(4) whether each offense requires proof of additional facts not required by the other, and

(5) whether the legislative intent suggests that one or several offenses were intended.

*State v. Black*, 524 S.W.2d 913, 919–20 (Tenn. 1975); *State v. Pelayo*, 881 S.W.2d at 10. The key test in determining whether sepa-

---

**3.** In *Oller*, the conviction for especially aggravated burglary was reduced to burglary under Tenn.

Code Ann. § 39–14–404(d). 851 S.W.2d at 843.

rate punishments can be imposed for offenses arising out of the same act or transaction is "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

■ Here, the offenses for which the defendant was convicted do not violate double jeopardy under the *Blockburger* rule. A person commits aggravated assault by causing serious bodily injury or using or displaying a deadly weapon during the commission of an assault. Tenn.Code Ann. § 39-13-102(a). Assault is defined as (1) intentionally, knowingly, or recklessly causing bodily injury to another; (2) intentionally or knowingly causing another to reasonably fear imminent bodily injury; or (3) intentionally or knowingly causing physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative. Tenn. Code Ann. § 39-13-101(a).

Aggravated rape is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by certain listed circumstances. Tenn.Code Ann. § 39-13-502(a). The circumstances relevant to the facts here are that (1) force or coercion was used to accomplish the act and the defendant was armed with a weapon, and (2) the defendant caused serious bodily injury to the victim. Tenn.Code Ann. § 39-13-502(a)(1) & (2). A burglary of a habitation constitutes aggravated burglary. Tenn.Code Ann. § 39-14-403(a); *see* Tenn.Code Ann. §§ 39-14-401 & -402. The relevant definition of burglary is when a person enters a building other than a habitation with the intent to commit a felony or theft. Tenn. Code Ann. § 39-14-402(a)(1). An apartment would qualify as a habitation. *See* Tenn. Code Ann. § 39-14-401(1)(A). The trial court decided that the aggravated assault was a separate offense, reasoning that defense counsel would be correct had the jury found the defendant guilty of attempted premeditated and deliberate murder. We agree. Each of these offenses requires proof of a separate and distinct factual element. Further, the offenses were the result of separate occurrences.

■ Even under an *Anthony* analysis, the convictions were separate and distinct. While the offenses were obviously related, none were incidental to the other. The state's theory for each offense was based upon separate acts. The aggravated burglary conviction was based upon the entry into the apartment with the intent to commit rape. The initial stabbing of the victim's left hand and arm constituted the aggravated assault by causing serious bodily injury to the victim and by the defendant's use of a deadly weapon. A significant break in time passed before the defendant pulled the victim off the couch and raped her. A lapse of time also occurred after the rape and his attempt to murder the victim. Accordingly, we find that the facts warranted separate convictions. *See State v. Phillips,* 924 S.W.2d 662 (Tenn.1996).

■ The defendant also challenges the sufficiency of the evidence. On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); Tenn.R.App.P. 13(e).

■ The evidence adduced at trial established that the defendant was the person who attacked the victim. Eyewitness testimony from the victim was strongly corroborated by the results of the DNA analysis and blood tests. In our view, the evidence was clearly sufficient to support each of the convictions.

III

The defendant claims that the trial court erroneously instructed the jury by giving a

confusing jury charge which misstated the law. More specifically, he asserts that the verdict forms were defective.

■ The trial court has a duty to give a complete charge of the law applicable to the facts of the case. *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986). It is presumed that the jury follows the instructions of the trial court. *State v. Blackmon,* 701 S.W.2d 228, 233 (Tenn.Crim. App.1985); *Klaver v. State,* 503 S.W.2d 946 (Tenn.Crim.App.1973).

Here, the trial court properly instructed the jury as to the applicable law on each offense. The trial court then instructed the jury that it should consider whether the defendant was guilty of attempted felony murder as charged in Count One of the indictment; the court included the following language:

> If you find the defendant not guilty of attempted murder ... in count one ..., [n]ot [g]uilty would be your verdict.
>
> You would then proceed to inquire whether or not the defendant ... is guilty of intentional, deliberate and premeditated attempted murder ... in count two....

Similar instructions were given for the other counts alleging alternative theories of guilt. In an attempt to avoid confusion concerning whether a unanimous verdict would be required for each offense charged, the trial court included the following language recommended by the defendant:

> In order to convict the defendant of the offense alleged in each count of the indictment and the lesser included offenses, you must unanimously agree upon a particular theory of criminality for each offense alleged and unanimously agree upon the specific events or acts for each offense alleged that you find to support the theory of guilt for the offense.

The verdict forms contained language similar to the jury instructions. The trial court stated that he saw no alternative to the jury charge in order to permit the jury to demonstrate which theory they relied upon because the elements and mens rea were different for each offense.

■ The defendant challenges the validity of the verdict form for Count Three which alleges aggravated assault by the use of a weapon. He argues that it is impossible to determine "which conduct the jury found guilt for in Count Three, since both intentional and reckless conduct are alleged in the indictment." The law allows for alternative intents to be alleged in the same count. *See* Tenn.Code Ann. § 40–13–206(a); *see State v. Michael J. Howard,* 926 S.W.2d 579 (Tenn. Crim.App.1996). Further, the trial court properly instructed the jury on the definition of assault which may be committed either intentionally, knowingly or recklessly. *See* Tenn.Code Ann. §§ 39–13–101 & –102. This issue is meritless.

■ The defendant also asserts that because of defective verdict forms the jury failed to consider Count Four of the indictment which deals with aggravated assault by the infliction of serious bodily injury. Ordinarily, "a jury should consider all counts of an indictment and return verdicts as to all counts upon which they are able to agree, and to report to the court with respect to the counts upon which they are not able to agree." *State v. Johnson,* 634 S.W.2d 670, 673 (Tenn.Crim.App.1982). This procedure was properly followed in this case. The jury considered Count Four as a lesser included offense of intentional, deliberate and premeditated attempted murder in the first degree as directed on the verdict forms. The structure of the verdict forms properly allowed for separate consideration of Count Four only if the defendant was found not guilty of attempted deliberate and premeditated murder and attempted second degree murder. Regardless, Count Four was subsequently dismissed and any failure to consider Count Four would have been advantageous, not prejudicial, to the defendant. *See State v. Johnson,* 634 S.W.2d at 673–74.

■ Another argument asserted by the defendant is that the verdict forms for Counts Five through Eight were erroneous because they are not set forth in alternatives. Counts Five and Six were combined on the verdict forms as follows:

We the Jury, find the defendant, Guilty of Aggravated Rape ... hav[ing] ... committed [rape] by the following means:

\* \* \*

_____ A. force or coercion was used to accomplish the act and the defendant was armed with a weapon [count five];

_____ B. the defendant caused bodily injury to the alleged victim [count six].

_____ C. both A. and B. above.

Counts Seven and Eight dealing with aggravated burglary were similarly combined. The fact that the jury found the defendant guilty of only one count of aggravated burglary demonstrates that the jury interpreted the verdict forms as separate counts. Because the trial court provided the requirement for unanimous verdicts in its jury instructions, we find no error in the verdict forms.

■ The defendant claims that the trial court's decision not to provide the jury with the indictment was improper. The defendant fails to cite any authority for his argument. Waiver results when appropriate authority is not cited for contentions asserted on appeal. *State v. Smith*, 735 S.W.2d 831, 836 (Tenn.Crim.App.1987). Moreover, the defendant initially asked that the indictments not be read to the jury. Thus, the defendant has taken inconsistent positions. In any event, the claim is without merit.

While the trial court commented that it would "be amazed if [the jury] understood the charge," we believe that the instructions accurately reflected the applicable law. Further, and despite its concerns, the trial court observed that the jury "gave a lot of thought to [the] case." The record does not establish that the jury misunderstood the content of the charge. We, therefore, conclude that the instructions and verdict forms were not erroneous.

## IV

■ Next, the defendant claims that the trial court erred by ruling that the defendant was not in custody at the time he made the statement to Sergeant McKee. He claims that the statement should have been suppressed as a violation of his right to *Miranda* warnings. The state asserts that the defendant was not in custody at the time of the questioning and thus *Miranda* warnings were not required. We are bound by the trial court's determination that the defendant was not in custody at the time of questioning unless it "clearly appear[s] that there ha[s] been an abuse of discretion and a violation of the rights of the accused." *State v. Smith*, 868 S.W.2d 561, 570 (Tenn.1993); *Childs v. State*, 584 S.W.2d 783, 788 (Tenn.1979).

At the suppression hearing, Sergeant McKee testified that he initially checked on the victim in her apartment. He asked the victim if Ms. Nunez, who lived in the upstairs apartment, could watch the child she had been babysitting. The victim told Sergeant McKee that Ms. Nunez knew the Hispanic male who attacked her. After Officer Adams informed him that he had seen a Hispanic male in the Nunez apartment, Sergeant McKee went upstairs in order to make arrangements for someone to temporarily care for the baby. Officers Adams, Clanton, and Barber were in the Nunez apartment when Sergeant McKee entered. The defendant sat on the couch holding a baby. None of the officers had displayed weapons during the investigation. Sergeant McKee spoke casually with the defendant for a couple of minutes before asking how long the defendant had been downstairs with the victim. The defendant responded, "about an hour and a half." Sergeant McKee could not recall the substance of the preliminary conversation other than asking the defendant's name. After the incriminating statement, Sergeant McKee read the defendant his rights. The defendant appeared to have some difficulty in understanding. When the other officers discovered the bloody clothes on the back porch, Officer Adams read the defendant his rights a second time. The defendant was arrested shortly thereafter.

Sergeant McKee testified that the defendant was "under suspicion" and was a "possible suspect" prior to questioning him because he was a Hispanic male in close proximity to the crime scene. He stated that he was unsure whether he would have allowed the defendant to leave had he attempted to do so.

Officer Adams testified that he was the first officer to discover the victim. The victim told him that her assailant was a "Mexican" male with long, black curly hair and a moustache. She described the clothing worn by her assailant. The description resembled the Hispanic male Officer Adams had been in the Nunez apartment as he searched for the victim. After hearing the description, he informed the other officers of his suspicion. Officer Adams along with Officer Barber and Officer Clanton went to the upstairs apartment to investigate further. Officer Adams believed that he had "reasonable suspicion ... [to believe] [t]hat someone in the upstairs apartment was involved in the attack." Ms. Nunez allowed the officers to come inside. Officer Adams told her what had occurred in the apartment downstairs and received permission to search the apartment and the back porch for any evidence. Officer Adams did not observe any blood in the room or on the defendant's clothing.

While Officer Adams spoke to Ms. Nunez, Officer Clanton found a bag of clothes on the back porch. Officer Adams testified that the discovery of the clothes elevated the reasonable suspicion to probable cause. At that point, he noticed that Sergeant McKee was talking to the defendant. He immediately went over to the defendant and read him his rights. Officer Adams did not question the defendant further because he could not determine whether the defendant understood his rights. The defendant was subsequently arrested; the arrest occurred approximately twenty-five minutes after entering Ms. Nunez's apartment.

 Officer Adams testified that prior to entering the apartment he "considered the [defendant] detained for investigation." This fact was not communicated to the defendant. "A policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

The trial court denied the motion to suppress the statement based on its finding that the totality of the circumstances did not support a finding of custodial interrogation. In ruling that the defendant was not in custody at the time of the interrogation, the trial court found that "[t]he defendant was ... a suspect[ ] but was not necessarily ... the focus of the investigation." The court found the following supporting facts:

(1) that no one indicated to the defendant that he was under arrest at the time of interrogation;

(2) that the interrogation took place in a non-coercive atmosphere;

(3) that the defendant was not isolated from anyone;

(4) that the interrogation was limited to one question, "How long were you down there with that young girl?"; and

(5) that there was no evidence of mental or physical incapacity due to age or other handicaps.

Generally, *Miranda* warnings must precede custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The test to be applied to determine if an individual is in custody is whether a "reasonable [person] in the suspect's position" would have believed himself or herself to be "in custody." *Berkemer v. McCarty,* 468 U.S. at 442, 104 S.Ct. at 3151; *see generally State v. Cooper,* 912 S.W.2d 756 (1995). Our supreme court has used the terms accusatory and custodial stages interchangeably, yet acknowledges its "hairline" distinction with the investigatory stage. *Childs v. State,* 584 S.W.2d at 788. In *State v. Morris,* 224 Tenn. 437, 443, 456 S.W.2d 840, 842 (1970), the totality of the circumstances test was found to govern the classification of the interrogation; the critical factors were identified as follows:

(1) the nature of the interrogator;

(2) the nature of the suspect;

(3) the time and place of the interrogation;

(4) the nature of the interrogation; and

(5) the progress of the investigation at the time of the interrogation.

 Whether a person is in custody does not turn on whether the interrogation took place in a "coercive environment" but whether the suspect was "deprived of his

freedom of action in any significant way." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). On the other hand, because a person is interrogated in his or her own home does not automatically mean that the person is not in custody. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Each case must be judged on its own facts. Whether or not a suspect in a case has been subjected to a "custodial interrogation" is controlled by its own facts and all of the circumstances must be taken into consideration by the judge in making that determination. *State v. Nakdimen,* 735 S.W.2d 799, 800 (Tenn.Crim.App.1987). A central question is whether the suspect was "deprived of his [or her] freedom of action in any significant way." *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 713; *see State v. Furlough,* 797 S.W.2d 631, 639 (Tenn.Crim.App.1990).

Here, following questioning of the victim, the officers returned to the Nunez apartment where the defendant was located to continue their investigation. Both Sergeant McKee and Officer Adams testified that the defendant was under suspicion. Prior to Sergeant McKee's inquiry, none of the officers had even spoken to the defendant. The nature of the single question, however, suggests that the defendant was a primary suspect.

■ Whether the initial questioning was investigative or accusatory is a close issue under these facts. Yet the trial court is granted wide latitude in determining whether a suspect is subjected to custodial interrogation, thus requiring the guarantees of the Fifth Amendment of the United States Constitution and Art. I, § 9 of the Tennessee Constitution. *See State v. Chandler,* 547 S.W.2d 918, 923 (Tenn.1977). Here, the trial court carefully analyzed the facts under the totality of the appropriate test as set forth in *State v. Morris,* 456 S.W.2d at 842. Because the trial court saw and heard the witnesses and had a basis for its determination that the defendant was not in custody at the time of the questioning, we cannot find any abuse of discretion. *See State v. Smith,* 868 S.W.2d at 570. Thus, the statement was properly admitted.

■ Moreover, the evidence against the defendant was overwhelming. The victim identified the defendant. The circumstantial evidence was particularly incriminating. The forensic evidence was compelling. In our view, the admission of this single inculpatory statement, if erroneous, was harmless beyond any doubt. *See State v. Carpenter,* 773 S.W.2d 1 (Tenn.Crim.App.1989).

V

The defendant next claims that his sentence was excessive. He argues generally that all enhancement factors applied by the trial court were erroneously used to enhance his sentence because the factors are elements of the crimes for which he was convicted. *See* Tenn.Code Ann. § 40–35–114 (stating that the factors listed may be used to enhance a sentence as long as the factors are not themselves essential elements of the offense as charged in the indictment). Specifically, the defendant asserts that consideration of the enhancement factors were precluded because the indictments alleged and the jury found facts dealing with the use of a knife to stab the victim. The state contends that the defendant has failed to demonstrate that the sentence was improper.

■ When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991); *see State v. Jones,* 883 S.W.2d 597 (Tenn.1994).

■ Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or

treatment. Tenn.Code Ann. §§ 40–35–102, –103, & –210; *State v. Smith,* 735 S.W.2d 859, 863 (Tenn.Crim.App.1987).

In calculating the sentence for a felony conviction, the presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40–35–210(c). *But see* 1995 Tenn. Pub. Acts ch. 493 (amending the statute for offenses occurring on or after July 1, 1995, to make the presumptive sentence in a Class A felony the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn.Code Ann. § 40–35–210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn.Code Ann. § 40–35–210(e). The sentence may then be reduced within the range by any weight assigned to the mitigating factors present. *Id.*

At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applicable to the convictions for attempted felony murder, aggravated rape and aggravated burglary:

(1) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense, Tenn.Code Ann. § 40–35–114(5);

(2) The personal injuries inflicted upon . . . the victim were particularly great, Tenn. Code Ann. § 40–35–114(6); and

(3) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, Tenn.Code Ann. § 40–35–114(7).

The trial court also applied enhancement factor (9) in sentencing the defendant for attempted felony murder. Because, however, the conviction for attempted felony murder has been set aside, we will not address whether the enhancement factors were properly applied to that conviction. The trial court ruled that no enhancement factors applied to the aggravated assault conviction and held that no mitigating factors applied to any of the convictions. Based on a finding that the defendant was a dangerous offender under Tenn.Code Ann. § 40–35–115(b)(4), the trial court imposed consecutive sentences. Because the trial court properly followed the sentencing guidelines, our review will be *de novo* with a presumption of correctness. *State v. Ashby,* 823 S.W.2d at 169.

A. *The defendant treated or allowed the victim to be treated with exceptional cruelty (Tenn.Code Ann. § 40–35–114(5)).*

The defendant contends that factor (5), regarding exceptionally cruel treatment to the victim, does not apply to any of the offenses. We disagree.

▮▮▮▮ Whether the victim was treated with exceptional cruelty is not an element of the offenses of aggravated rape and aggravated burglary. *See* Tenn.Code Ann. § 29–13–502; Tenn.Code Ann. §§ 39–14–401, –402 & –403. The "exceptional cruelty" factor has been found to apply in cases dealing with abuse or torture. *See State v. Davis,* 825 S.W.2d 109, 113 (Tenn.Crim.App.1991), *perm. to app. denied,* (Tenn.1992). That is the case here. While raping the victim, the defendant held a knife to her throat and bit her breasts, causing bruises. Afterwards, he stabbed her 67 times; the injuries were so severe as to require general anesthesia to suture. Moreover, he attempted to smother the victim with a towel as he repeatedly stated his desire to kill her.

▮▮▮▮ When applying enhancement factor (5), a trial court "should state what actions of the [d]efendant, apart from the elements of the offense constituted 'exceptional cruelty.' " *State v. Goodwin,* 909 S.W.2d 35, 45–46 (Tenn.Crim.App.1995). Here, the trial court did so. Further, the trial court found the offenses to be "especially horrifying and shocking." We agree. Thus, the "exceptional cruelty" factor applies to the aggravated rape and aggravated burglary conviction. *See State v. James E. Winston,* No. 01C01–9302–CR–00069, 1994 WL 390425 (Tenn. Crim.App., at Nashville, July 28, 1994), *perm. to app. denied,* (Tenn.1994).

B. *The victim sustained particularly great personal injuries (Tenn.Code Ann. § 40–35–114(6)).*

The defendant generally argues that factor (6) should not have been used to enhance his

sentences because "serious bodily injury" was an element of the crimes for which he was convicted. We cannot agree.

 Unlawful sexual penetration in combination with "bodily injury to a victim" is only one method by which a person can commit an aggravated rape. *See* Tenn.Code Ann. § 39–1–502. Here, the jury found the defendant guilty of two counts of aggravated rape; one count alleged "bodily injury" and the other count relied upon the provision dealing with the use of force or coercion and the employment of a weapon. *See* Tenn. Code Ann. § 39–13–502(a)(1) & (2). The trial court merged the findings of guilt on the alternative counts of aggravated rape and subsequently dismissed the count dealing with bodily injury. Because of this, the trial court could properly apply the enhancement factor (6) regarding "particularly great personal injuries." *See State v. Kissinger*, 922 S.W.2d 482, 487–88 (Tenn.1996) (trial court may properly apply enhancement factor (6) where evidence establishes that physical or mental injuries were particularly great). Here, the record demonstrates that the victim required counseling and prescribed medication as a result of the defendant's actions. Further, the trial court based its decision to apply factor (6) to the aggravated rape conviction on the "physical pain which must have been endured by sustaining well over 50 stab wounds . . . ." We agree with that decision.

 Aggravated burglary is defined in Tenn.Code Ann. § 39–14–403(a) as burglary of a habitation as defined in §§ 39–14–401 and –402. These provisions do not include "serious bodily injury" as an element of the offense. Thus, factor (6) was also properly applied to the aggravated burglary conviction.

C. *The offense was committed to gratify the defendant's desire for pleasure or excitement (Tenn.Code Ann. § 40–35–114(7)).*

That the offenses were committed to gratify the defendant's desire for pleasure was also used to enhance the length of the sentences. Tenn.Code Ann. § 40–35–114(7). The defendant, however, claims that the state failed to meet its burden of demonstrat-

ing that the aggravated rape was sexually motivated as required by *State v. Adams*, 864 S.W.2d 31, 34 (Tenn.1993). We must disagree.

 Our supreme court has held that this factor can be applied in sex offense cases because many such offenses are committed for reasons other than sexual pleasure or excitement, e.g., acts of violence or a desire for control. *See State v. Kissinger*, 922 S.W.2d at 490; *State v. Adams*, 864 S.W.2d at 35. Further, "[t]he motive [for commission of the offense] need not be singular for the factor to apply, so long as defendant is motivated by [a] desire for pleasure or excitement." *State v. Kissinger*, 922 S.W.2d at 490–91. Here, the trial court reasoned that the factor should apply because of "the method and manner of the commission of the offense—the breaking into the home, . . . [t]he holding of the victim for that period of time[,] . . . the infliction of the injuries and the manner in which they were inflicted . . . ." The trial court distinguished the case from one dealing with minimal force because "it was not a situation where some force was used . . . [during the rape] and the defendant fled." We agree with that analysis.

 Enhancement factor (7) may also be applied when there is proof of pleasure or excitement of a sexual nature. *Id.* Here, a co-worker of the defendant testified that the defendant had told him that he planned to "go out and get drunk and get some pussy" the weekend of the offense. Further, the victim testified that the defendant forced her to remain naked for a period of time after the rape. While the state argues that evidence of semen stains supports the application of factor (7), our supreme court, however, has recently ruled that proof of orgasm, standing alone, is insufficient for the application of factor (7). *Id.* The court reasoned that "the focus is on the offender's motive, not the eventual result." *Id.* Thus, orgasm is merely a factor a court may consider in determining whether to apply factor (7). *Id.* Here evidence other than the mere emission of semen was introduced to show the defendant's motive. Under these circumstances, it is our view that the trial court properly

applied factor (7) to the convictions for aggravated rape and aggravated burglary.

Aggravated rape, a Class A felony, provides for a sentencing range of fifteen (15) to twenty-five (25) years for a Range I offender. *See* Tenn.Code Ann. § 40–35–112(a)(1). A Range I sentence of three (3) to six (6) years is possible for a conviction of aggravated burglary, a Class C felony. Tenn.Code Ann. § 40–35–112(a)(3). We agree with the trial court's decision to sentence the defendant to the maximum for his aggravated burglary conviction and to impose an upper-range sentence for the rape conviction. Here, however, the aggravated assault sentence of three years was to be served concurrently with the attempted felony murder conviction; the defendant was to serve his attempted felony murder sentence consecutive to the aggravated rape and aggravated burglary. Thus the trial court clearly intended to impose a lengthy sentence. We fully agree with that aim.

■ The defendant raises for the first time on appeal the issue of excessive fines. Ordinarily, issues raised for the first time on appeal are waived. *See State v. Burtis*, 664 S.W.2d 305, 310 (Tenn.Crim.App.1983). Despite this fact, we will address the merits of the claim.

In *State v. Bryant*, 805 S.W.2d 762, 766–67 (Tenn.1991), our supreme court held that the constitution did not prohibit appellate review of fines. *See* Tenn. Const. art. VI, § 14. Fines are generally assessed by the jury unless the defendant waives this constitutional protection. Tenn.Code Ann. § 40–35–301; *State v. Mahoney*, 874 S.W.2d 627, 630 (Tenn.Crim.App.1993).

■ A defendant's ability to pay is a factor in the establishment of fines. Tenn. Code Ann. § 40–35–207(a)(7); *see State v. Marshall*, 870 S.W.2d 532, 542 (Tenn.Crim. App.1993) (stating that a defendant's ability to pay "is not necessarily a controlling [factor]"); *State v. Michael Westley Portzer*, No. 01C01–9208–CC–00252, 1993 WL 311516 (Tenn.Crim.App., at Nashville, August 12, 1993), *perm. to app. denied*, (Tenn.1993). Because the trial court failed to set forth any findings of fact concerning the defendant's

ability to pay a fine, our review is *de novo* without a presumption of correctness. *State v. Ashby*, 823 S.W.2d at 169; *see State v. Jones*, 883 S.W.2d 597 (Tenn.1994).

■ Here, the jury assessed and the defendant received the maximum possible fine for his convictions of aggravated rape, aggravated assault and aggravated burglary. *See* Tenn.Code Ann. § 40–35–112(a)(1) & (3). The trial court made no specific findings about the defendant's ability to pay the fines. It is apparent from the record that the defendant qualified as an indigent. A declaration of indigency, standing alone, does not, however, immunize the defendant from fines. It is merely one factor which may be taken into account.

■ Because the record does not establish why the fines are excessive and because the defendant has the burden to do so on appeal, we defer to the trial court in its acceptance of the fines recommended by the jury in the amount of $70,000. *See State v. Miller*, 737 S.W.2d 556, 558 (Tenn.Crim.App. 1987). The seriousness of the offenses support the punitive nature of the fine assessed. *See State v. Marshall*, 870 S.W.2d at 542; *State v. Harold Franklin Jones*, No. 03C01–9110–CR–330, 1992 WL 158279 (Tenn.Crim. App., at Knoxville, July 8, 1992) (holding that a fine of $50,000 for a conviction of second degree murder was not excessive even though the defendant claimed to be an indigent).

## VI

In his last argument, the defendant argues that the trial court erred by denying his motion for a trial transcript to be used in preparation for his motion for a new trial. Specifically, he claims that denying an indigent the right to a trial transcript amounts to a violation of the equal protection clauses under federal and state law. *See* U.S. Const. amend. XIV; Tenn. Const. art. XI, § 8. We disagree.

The trial court observed that defense counsel took notes throughout the proceedings. Its ruling was consistent with the "policy of this Court . . . not to order transcripts unless

[the defendant] can show ... a need [i.e., a change in counsel]."

■ Absent a showing of prejudice, the defendant is not entitled to a trial transcript, at the expense of the state, for use in preparing for a motion for new trial. *See Seelbach v. State*, 572 S.W.2d 267 (Tenn.Crim.App. 1978); *see also State v. Len Martucci*, No. 213, 1990 WL 36251 (Tenn.Crim.App., at Knoxville, April 3, 1990), *perm. to app. denied*, (Tenn.1990). While our supreme court has stated that "the better procedure would be to require a transcript be provided the indigent defendant" when there is "any possibility of need," *State v. Elliott*, 524 S.W.2d 473, 477 (Tenn.1975), this court has determined prejudice does not occur when trial counsel is able to rely upon his notes taken during the trial in order to raise issues in the motion for new trial. *State v. Len Martucci*, slip op. at 5, 1990 WL 36251; *see also State v. Riggins*, 645 S.W.2d 419, 420–21 (Tenn. Crim.App.1982) (stating that no violation of equal protection occurs when adequate alternatives to a trial transcript are available for an indigent defendant who requests a transcript of a prior proceeding for defense purposes).

■ The defendant relies upon *State v. Draper*, 800 S.W.2d 489 (Tenn.Crim.App. 1990), in support of his claim. *Draper*, however, dealt with an indigent defendant's right to a trial transcript on appeal and not for purposes of preparing for a motion for new trial. *Id.* at 493. More importantly, the defendant has failed to show any prejudice from the denial of a trial transcript; all grounds in this direct appeal appeared in the motion for new trial. This issue is without merit.

In summary, we reverse and dismiss the conviction for attempted felony murder. We otherwise affirm the imposition of fines in the amount of $70,000 and the sentences imposed for the aggravated assault, aggravated rape and aggravated burglary convictions.

SUMMERS and TIPTON, JJ., concur.

SUMMERS, Judge, dissenting and concurring.

I agree with the majority's dismissal of the attempted felony murder conviction. Our Supreme Court, in *State v. Kimbrough*, 924 S.W.2d 888 (Tenn.1996), ruled that attempted felony murder is not a crime in Tennessee. I would find that the attempted second degree murder conviction could be revived. After the jury spoke, no reason exists to invalidate its verdict. The appellant should be sentenced for that conviction without the state's having to try him again.

The jury found the appellant guilty of both attempted felony murder and attempted second degree murder. Prior to sentencing, the trial judge narrowed the convictions for which the appellant would be sentenced. The trial judge was of the impression that attempted second degree murder was a lesser included offense of felony murder.

> Court: ... But it seems to the Court that the Attempted 2nd degree murder would merge with the Attempted Felony murder.
>
> Are we in agreement on that? Does the State agree with the Court?
>
> [Prosecutor]: ... Is that what the Court is ruling? Yes, sir, we would agree with that.

The trial judge then *sua sponte* dismissed the attempted second degree murder charge.[1]

A judgment which is void is in legal effect no judgment and cannot operate as a merger since it is subject to collateral impeachment at any time. *See Hamm v. Hamm*, 30 Tenn. App. 122, 204 S.W.2d 113 (1947) (holding "such judgment unavailing as a defense ... [as] it is obvious that the [void] judgment produced is in fact no final determination of the rights of the parties, and that no obstacle has intervened to prevent them from seeking such determination.").

At the risk of misquoting him or, even worse, misinterpreting his meaning, I rely on

---

1. Interestingly, there appears to be neither an oral nor a written motion by either party requesting dismissal of the attempted second degree murder charge. Moreover, the appellant's brief notes the order's irregularity. The order was never signed by either party nor does it appear that the order was ever served on either party.

the perdurable statement of Professor E.E. Overton of the University of Tennessee College of Law: "If it's void, it's void." Dr. Overton has taught this concept to hundreds of his students, including me. I think I know what it means now. In the context of this case, the attempted felony murder judgment is void. The trial judge merged the attempted second degree murder with a void judgment. A void judgment, however, cannot constitute a final determination. The attempted second degree murder conviction, therefore, could not merge with the void judgment.

The merger was void and of no legal effect. Accordingly, I would order the trial court to enter a judgment affirming the attempted second degree murder conviction. The trial court would then sentence the appellant on that conviction. To do otherwise wastes judicial resources.

In all else, I concur.

TIPTON, Judge, concurring.

I concur fully with the majority opinion, given the present state of the law. However, I would hope that our supreme court would revisit its holding in *State v. Kimbrough*, 924 S.W.2d 888 (Tenn.1996), relative to there being no crime of attempt to commit felony murder. In it, our supreme court notes that an attempt to commit a crime necessarily involves an intended act or result. 924 S.W.2d at 890. It also notes that felony murder, at the time of the offense, required that the killing be committed recklessly. It then reasons that "it is logically and legally impossible to attempt to perpetrate an unintentional killing," stating, as well, "that one cannot intend to accomplish the unintended." *Id.* at 892. By this path, the court concludes that "the offense of attempted felony-murder does not exist in Tennessee." *Id.*

However, our criminal code expressly provides that the culpable mental state reflected by an "intentional" act legally suffices to establish the culpable mental states of criminal negligence and recklessness, as well. That is, T.C.A. § 39–11–301(a)(2) states:

When the law provides that criminal negligence suffices to establish an element of an offense, that element is also established if a person acts intentionally, knowingly or recklessly. When recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly. When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally.

As the Sentencing Commission Comments explain, the lesser levels of culpability are included by law in the greater so that "a person who acts 'intentionally' also acts knowingly, recklessly and with criminal negligence."

In other words, although a felony murder required only a reckless killing, a conviction may be obtained even though the proof showed that the killing was intended. It would make no sense to conclude that the presence of a more culpable mental state would have any legal bearing on the chances for conviction. Similarly, the fact that an attempt to commit a crime requires an intent to commit that crime, which may only need a "reckless" mental state, should not be viewed to bar a conviction for attempt—although the attempt necessarily limits convictions to cases where the defendant's intention is proven. The fact that the crime is not completed should not make any difference.

The potential reach of *Kimbrough* is fairly wide in that its reasoning would apply to an attempt to commit any offense having a reckless, criminally negligent, or even no culpable mental state as an element. Such a result should not occur. I am authorized to state that Judge Wade concurs in this opinion, as well.