IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 15, 2005

### ALLEN OLIVER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26580     Arthur T. Bennett, Judge**

---

### No. W2005-00677-CCA-R3-PC  - Filed January 5, 2006

---

The petitioner, Allen Oliver, pled guilty in the Shelby County Criminal Court to numerous offenses and received a total effective sentence of twenty-three years incarceration in the Tennessee Department of Correction.  Subsequently, the petitioner filed a petition for post-conviction relief, alleging that his guilty pleas were not knowingly and voluntarily entered and that his attorneys were ineffective.  The post-conviction court denied the petition, and the petitioner appeals.  Upon our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Brett B. Stein (on appeal) and Kamilah E. Turner (at trial), Memphis, Tennessee, for the appellant, Allen Oliver.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Chris Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On July 2, 2001, the petitioner pled guilty to eight offenses: one count of attempted first degree murder, one count of  especially aggravated burglary, two counts of aggravated assault, one count of aggravated kidnapping, one count of assault, one count of stalking, and one count of harassment.  The offenses were based upon the petitioner's repeated brutal attempts to kill his estranged wife.  As a result of his pleas, the petitioner received a total effective sentence of twenty-three years.

Subsequently, the petitioner filed a petition for post-conviction relief, alleging that his guilty pleas were not knowingly and voluntarily entered. Counsel was appointed to assist the petitioner, and an amended petition was filed, claiming that his attorneys were ineffective in failing to realize that he did not have the mental capacity to plead guilty.

Vivian Woods, the petitioner's sister, was the first witness to testify at the petitioner's post-conviction hearing. Woods stated that in 2001, the petitioner's family hired trial counsel to represent the petitioner. Counsel, the petitioner, and the petitioner's family had several meetings regarding the petitioner's case. Woods stated that the petitioner and his family agreed that he should take the case to trial. Therefore, she was surprised when the petitioner pled guilty on July 2, 2001.

Woods recalled that when the petitioner walked into court to plead guilty, "[h]e looked like he was like just out in space. Not – not of himself." She stated that the petitioner did not acknowledge the family's presence in the courtroom or make eye contact with her. She characterized the petitioner's lack of acknowledgment as "unusual." Woods maintained that the petitioner did not appear to understand the proceedings, noting that the proceedings were halted at one point in order for the petitioner to speak with counsel. Woods asserted that she was unhappy with the petitioner's decision to plead guilty. Woods acknowledged that she did not speak with the petitioner immediately prior to or after his guilty pleas.

Tarolyn Davenport, the petitioner's first cousin, testified that she was present during the petitioner's guilty pleas. Davenport stated that during the plea hearing, the petitioner did not look or act like himself. Specifically, she noted that the petitioner's speech was delayed or slurred, as if he were on medication. Davenport knew that the petitioner took medication. Davenport admitted that the petitioner answered all of the questions posed to him during the plea proceedings.

Davenport's husband, Byron Davenport, testified that he was present at the petitioner's plea hearing. Mr. Davenport stated that the petitioner "wasn't perky like he usually be. He was – everything he was doing, it was delayed. Moving slow. Acting slow. Things like that." He related that despite his reservations about the petitioner's behavior, he did not report his concerns to the petitioner's attorneys or to the court. He explained that he did not believe he could address counsel or the court.

Angela DePriest, the petitioner's first cousin, testified,

> Well, my observations was from the time I seen [the petitioner] when he came in he – he didn't look right. And to my knowledge as long as I've been around him, he wasn't right. He was heavily sedated from his medications because I mean, I be – I be around him all the time. And there was that time I seen [the petitioner], I have never seen him like that before so I knew something was wrong.

She stated that "truthfully he answered all his questions. But he was not alert as he usually would be, so that further letted me know that something was wrong with [him]." DePriest acknowledged that she did not speak with the petitioner immediately after his plea. Sometime after the plea, the petitioner called her and asked what had transpired during the plea proceedings. DePriest told the petitioner that he had pled guilty. DePriest stated that she never voiced her concerns to the petitioner's attorneys.

The petitioner testified at the post-conviction hearing that he had been represented by two attorneys at trial; one was lead counsel and the other was co-counsel. The attorneys had represented the petitioner for a little over two years. The petitioner told his attorneys that he was not guilty of the charged offenses. He said that he would like to be sent to a treatment facility; otherwise, he wanted to go to trial. The petitioner asserted that his attorneys were aware of his history of mental illness and knew that he had been hospitalized on two occasions due to his mental illness. The petitioner signed an authorization allowing his attorneys to access his medical records, and his attorneys obtained the records. He believed that his mental illness was going to be an issue at trial. The petitioner admitted that his attorneys had arranged for him to have a mental evaluation.

The petitioner stated that he was taking medication for his mental illness. He further stated that when he did not take his medication, he became depressed and could not think straight. The petitioner maintained that he did not take his medication on the day of his pleas. He said that on the day of his pleas he was not aware of what was happening and was unable to recall most of the day. The petitioner stated that he believed he was going to trial or to a treatment facility. He did not know that he was going to jail.

The petitioner's lead trial counsel testified that he had been practicing law since 1997, solely in the area of criminal law. Counsel testified that the petitioner faced a "fairly heinous" set of facts. Because of the petitioner's history of mental illness, counsel chose to pursue a defense based upon the petitioner's mental difficulties, possibly a diminished capacity defense. On September 8, 2000, counsel received a letter from Dr. Hudson at the Midtown Mental Health Center. The letter stated that Dr. Hudson had evaluated the petitioner and found that his ability to confer with counsel and participate in his defense was questionable. Thereafter, the petitioner was sent to the Middle Tennessee Mental Health Institute (MTMHI) for further evaluation. The MTMHI evaluation, detailed in a letter dated November 2000, determined that the petitioner was competent to stand trial and that "[h]e did not meet the criteria for an insanity defense." After receiving this evaluation, lead counsel asked the trial court to declare the petitioner indigent and provide funds for a neuropsychological evaluation. The trial court denied the request for funding. Lead counsel testified that the denial of funds rendered the ability to defend the case "dead in the water." After the denial of funds, counsel began concentrating on obtaining a favorable settlement to the case. Lead counsel said that after the request for the evaluation was denied, going to trial without an expert was never discussed.

Lead counsel asserted that the petitioner seemed to display "two different comprehensive skill levels." Counsel stated that when visiting the petitioner, he and co-counsel alternatively

referred to the petitioner as "Allen" or "Mr. Oliver." Counsel explained, "Mr. Oliver would be the person I would describe as the person who would not understand anything that was going on, sir. Allen is how I described him as being the person I could correlate to talk to and understand and he could understand me." Counsel recalled that on the day of the petitioner's pleas, "I thought I was seeing Allen until the point of the consecutive/concurrent sentencing came up. That's when he looked confused and gave me the appearance of what I call Mr. Oliver." At that point in the plea proceedings, lead counsel requested that the trial court afford him an opportunity to speak with the petitioner, informing the court that "[h]e just asked me a question that leads me to think he may not know what's going on in this. I just want to make certain we have an effective guilty plea." Lead counsel then took the petitioner aside and explained which sentences were to be served concurrently and which were to be served consecutively. The petitioner seemed to understand the explanation. Thereafter, the plea proceedings resumed, and the petitioner entered his guilty pleas. Lead counsel asserted that he would have stopped the plea proceedings if he had felt that the petitioner could not understand what was happening. Additionally, he noted that the petitioner did not exhibit any strange behavior during the plea proceedings.

Co-counsel testified that he met with the petitioner on numerous occasions during his representation. The petitioner was facing several charges and a potential total effective sentence of more than fifty years. The attorneys knew that two options existed: accepting a plea bargain or presenting a mental defense at trial. Co-counsel believed that most of the State's evidence would be difficult to refute at trial. Moreover, the defense would need to explain the horrific facts underlying the offenses.

Co-counsel recalled that mental health experts had found that the petitioner was competent to stand trial and that there were no grounds to support an insanity defense. Thereafter, the defense began to receive plea offers from the State. The petitioner accepted the last offer made by the State prior to trial. The petitioner was given at least a weekend to consider the plea offer. Co-counsel stated that he was aware the petitioner had a history of mental health issues, and the petitioner's defense was seriously hurt by the trial court's refusal to provide funds for a private mental health expert. Therefore, the petitioner decided to accept the plea offer.

Co-counsel stated that the petitioner was not coerced into accepting the pleas. Further, he noted that there were no indications at the plea hearing that the petitioner did not understand the proceedings. Co-counsel recalled that the petitioner did not want to go to trial and never suggested that he did not want to plead guilty. Co-counsel opined that the only confusion on the petitioner's part was regarding which sentences would be served consecutively and which would be served concurrently; there was no confusion regarding the decision to plead guilty. Co-counsel asserted that he and lead counsel always considered the petitioner's mental health issues when communicating with him.

At the conclusion of the post-conviction hearing, the post-conviction court found that the petitioner had not established by clear and convincing evidence that his pleas were not knowing and voluntary or that counsel were ineffective. The petitioner appeals, "respectfully submit[ting] that

there was sufficient evidence in the record to raise a sufficient doubt as to the accused's competence to enter a guilty plea."

## II. Analysis

Initially, we note that to be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

As we noted earlier, in the lower court the petitioner raised issues concerning whether his pleas were knowing and voluntary and whether his counsel were ineffective. After searching the petitioner's appellate brief, we conclude that he has abandoned those issues on appeal. Instead, on appeal, the petitioner's sole issue is phrased "[w]hether or not the evidence raised a sufficient doubt as to the accused's competence to entry of the plea of guilty deprived of the due process of law." Initially, we note that the manner in which the issue is stated can best be described as indecipherable. In his argument, the petitioner cites Moten v. State, 935 S.W.2d 416, 421 (Tenn. Crim. App. 1996) and contends that the trial court "should have stopped the [plea] proceeding and set this matter for a hearing to determine the effect of the medication over [the petitioner's] mental condition." After our thorough review of the petitions for post-conviction relief, we cannot find that the petitioner raised this issue in the lower court. Generally, we will not address issues raised for the first time on appeal. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).[1] Regardless, the petitioner is not entitled to relief.

In the instant case, the post-conviction court implicitly accredited the testimony of trial counsel. The court noted that counsel sought a mental evaluation of the petitioner. The petitioner was found competent to stand trial and was found to be sane at the time the offenses were committed. The defense was hampered when the trial court denied funds for a private mental health expert. Therefore, counsel began presenting plea offers to the petitioner. Counsel explained the offers to the petitioner, and the petitioner ultimately decided to enter guilty pleas to various offenses. The petitioner was facing a total effective sentence of more than fifty years if he proceeded to trial; however, with his pleas, he received a total effective sentence of twenty-three years.

---

[1] Additionally, we note that the petitioner's appellate brief fails to conform with the dictates of Tennessee Rule of Appellate Procedure 27(a).

The post-conviction court noted counsel's testimony that the petitioner understood the plea proceedings. The court acknowledged that there was some temporary confusion regarding which sentences were to be served consecutively and which were to be served concurrently. Therefore, the proceedings were halted, and lead counsel discussed the pleas with the petitioner. After counsel explained the terms of sentencing, the petitioner understood what was happening. The court further noted that the petitioner responded appropriately to questioning at the plea hearing.

Our review of the transcript of the plea hearing reflects that the trial court thoroughly reviewed with the petitioner his rights, the offenses to which he was pleading guilty, and the sentences which he was receiving. The petitioner repeatedly assured the trial court that he understood his pleas. The post-conviction court observed that the petitioner had initially asserted in his post-conviction petition that he did not understand the plea proceedings due to the medication he was taking; however, at the post-conviction hearing, the petitioner asserted that he was confused about the plea proceedings because he had not taken his medication prior to the hearing. We note that the petitioner's stance on appeal is inconsistent to his post-conviction testimony because he argues that he was not competent to plead guilty because he was taking three medications at the time of his pleas. In denying the post-conviction petition, the post-conviction court took "notice of the discrepancy in the Petitioner's various positions." The court found that the petitioner understood his pleas. We agree with the post-conviction court. Accordingly, the petitioner has failed to establish by clear and convincing evidence any of his claims for relief.

### III.  Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE