IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 29, 2020 Session

**STATE OF TENNESSEE v. CARDIS TERRAN BURNS**

**Appeal from the Criminal Court for Knox County**
**No. 109228   Steven Wayne Sword, Judge**
_____

**No. E2018-01685-CCA-R3-CD**
_____

Defendant, Cardis Terran Burns, appeals his convictions of multiple drug offenses and driving offenses.  Defendant appealed, arguing that the trial court improperly admitted text messages from a phone seized during a traffic stop.  While the appeal was pending, Defendant died.  Counsel for Defendant filed a motion to abate ab initio.  After the release of *State v. Al Mutory*, 581 S.W.3d 741 (Tenn. 2019), this Court denied Defendant's motion and determined that the appeal should proceed despite Defendant's death.  After our review, we affirm the judgments of the trial court but remand for entry of a new judgment form to correct a clerical error to reflect that the conviction for possession of methamphetamine in a drug free zone with intent to deliver (count 4) merged with the conviction for possession of methamphetamine in a drug free zone with intent to sell (count 3).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Andrew Pate (at motion for new trial and on appeal), and Cameron Bell (at trial), Knoxville, Tennessee, for the appellant, Cardis Terran Burns.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott and Kenneth Irvine, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In October of 2016, Defendant was indicted by a Knox County grand jury with possession of heroin in a drug free zone with the intent to sell, possession of heroin in a drug free zone with the intent to deliver, possession of methamphetamine in a drug free zone with intent to sell, possession of methamphetamine in a drug free zone with intent to deliver, simple possession of Alprazolam,[1] simple possession of marijuana, driving on a revoked license, and speeding. The indictment arose after a traffic stop on June 6, 2016.

Prior to trial, Defendant filed a motion to suppress the search and seizure of two cell phones that were found during the traffic stop—a white iPhone and a flip phone— and the information contained on those cell phones. At a hearing on the motion to suppress, counsel for Defendant argued that the search of the phones was unauthorized and violated Defendant's rights under the Confrontation Clause and that the search warrant was invalid.

*Hearing on the Motion to Suppress*

At the hearing on the motion to suppress, Investigator Terry Pate testified that he was called to a traffic stop in Knoxville on June 7, 2016. When he arrived, Defendant was in the back of a police car. Investigator Pate explained that Defendant went by the name "Rock as a rapper." Investigator Pate could not recall if the two cell phones at issue had been recovered from the vehicle at the time he arrived. Investigator Pate asked Defendant "if there was anything illegal on the phones." Defendant told the officer that he sold Xanax but did not make any statements regarding the ownership of the cell phones. However, after examining the phones, Investigator Pate concluded that the phones belonged to Defendant. The officer explained, "[I]n [the iPhone] his e-mail was the Real Rock something, and then in the other phone someone texted him, and says, 'Rock, do you have any poles?' or something like that." Investigator Pate saw Defendant's middle name on the iPhone, along with "photographs, like selfies, of [Defendant]." Investigator Pate did not see Defendant's name or nickname on the flip phone. Investigator Pate was not sure where the phones were found, as they had already been seized at the time he arrived on the scene.

The trial court determined that Defendant "ha[d] no standing on the flip phone [because] he's contesting that it was his and sounds like the proof he's presented is really to say it wasn't his." With respect to the iPhone, the trial court determined that

---

[1] The indictment originally charged Defendant with possession of Diazepam. The indictment was amended on agreement of the parties to reflect Defendant was in possession of Alprazolam.

Defendant had standing to contest the admissibility of the information found on the iPhone. Counsel for Defendant did not object to the introduction of the iPhone. His main issue was "with the flip phone." The trial court commented that the next thing to address was the "search of the iPhone, and if we get past that, then we have to look at the 401, 403 issue on the iPhone as well as the 401, 403 issue on the flip phone."

Investigator Pate continued his testimony, explaining that he was assigned to the Appalachian HIDTA[2] drug-related death task force. Investigator Pate stated that he had worked in the past with an organized crime division as a narcotics investigator and served on the drug task force and the repeat offender squad. Officers applied for a search warrant because Defendant was "caught with narcotics" and that led them "to believe he was utilizing one or both of those phones to communicate to [his] customers or suppliers." Investigator Pate "assume[d] that he would use both phones."

Officers were able to use a program called Cellebrite to extract the information off of the iPhone, but the flip phone had to be "visually examine[d]" because of the technology on the phone. Investigator Pate admitted he did not make a disk containing the information from the iPhone and did not recall having a disk. He explained that any record of the information from Cellebrite for the iPhone was lost between the search and the trial. However, Investigator Pate looked at the iPhone again prior to trial and took photographs of some of the items found on the iPhone.

On cross-examination Investigator Pate referred to several text messages from June 5 and June 6 on the flip phone as follows:

(1) "K. This is Christy. You still got some poles. I got a girl want a few."
(2) "I got a tool I'm trying to get rid of."
(3) "Yo, Rock. It's Nate. Front me a bag, if you can."
(4) "This is Derek. Do you want me to work on your speakers?"
(5) "I got bread for you, bruh."

Investigator Pate explained that "poles" referred to Xanax and that a "tool" was a slang for a firearm. According to Investigator Pate, a "bag" referred to drugs, and "bread" could either refer to money or Xanax. Investigator Pate testified that Defendant referred to himself as "the Real Rock" on Instagram and YouTube. Investigator Pate stated that the messages sent from the iPhone referred to the sender as "K Rock," but the message on the flip phone referred to someone named "Rock."

---

[2] Investigator Pate does not explain the meaning of the letters in the acronym.

Investigator Pate also reviewed items found on the iPhone. Specifically, Investigator Pate identified one photograph that depicted an email with Defendant's name, "Cardis Burns," in the sender area. Another photograph identified an email address of "therealrock259@gmail.com." Another photograph identified a text message sent from the iPhone to another number stating "This is K Rock." Another text, received on the iPhone on June 3 said, "Rock, what it do?" The next item is an image of Samuel L. Jackson. Beneath the image it said, "Samuel L. K Rock, [R]ock when he stepped off the bus in Chicago." The response to the text message was described by Investigator Pate as "laughing face emojis." There was also a photograph of a firearm on the iPhone. On June 1, the iPhone received a message stating, "Bruh, I need to get at you later on." The person in possession of the iPhone replied, "Okay. What's up Bro?" The next text message indicated that the person would "come and see . . . later 'bout some bread." Another text message talked about "[g]etting faded," slang for getting drunk or high, according to Investigator Pate. The phone also contained various "selfies" depicting Defendant.

At the conclusion of the hearing, the trial court commented:

The defense argues that the information on the flip phone is not relevant, because it's not his phone, and so whatever anybody is saying to whoever the owner of this phone is should not affect [Defendant], and so that's sort of what led them in sort of the standing predicament that they had is if you're saying, "It's not my phone, "then you lose your standing to challenge the search of that phone, and so you're sort of in - - in a catch-22 there from [Defendant's] perspective.

And so the Court does find that the information on the flip phone in these text messages are certainly relevant based upon Investigator Pate's testimony as to the intent to sell or deliver, and that is what [Defendant] is charged with, not simple possession, and so what we have from the flip phone - - . . . .

There are basically five separate texts that the State wants to get into evidence. . . .

Now, the State is not seeking to introduce this for the truth of the matter asserted . . . . What is relevant about this and the purpose the [S]tate is seeking to introduce it is that the receiver of that is somebody that someone would come to obtain narcotics, and so it - - it is relevant as to whoever was the owner or maintainer of this phone. So, it's not hearsay, because it's not offered to prove the truth of the matter asserted in that. It's

- 4 -

offered to prove who the listener is or the person receiving the text message, and so that's pretty similar on all of these.

. . . .

So I think there's relevance there. I don't think there's a danger of unfair prejudice, 'cause [Defendant's] argument is that this isn't his phone, and so you can make that argument all day long and say the person receiving these text messages is a dirty, awful drug dealer, but it's not me, and so I think you lose on the relevance and the 403 on that.

The iPhone really is - - the relevance for this iPhone stuff is all identity virtually, and the references to Rock throughout it. There's no - - there's nothing in here that would be, I think, a danger of unfair prejudice to him, 'cause it's all fairly benign that's in here. It's all about identity, and the language being used, or the words being used to refer to the person who's the owner of the iPhone, which the state has shown to be [Defendant] and I think the state made mention they're going to pull out certain things that I think do need to come out, . . . . .

The rest of it really is just references to the word "bread" and "Rock" and "K Rock" to show identity. And so I think that - - that and the pictures showing who the purported owner of the phone is, is all relevant to establish identity of the owner of the iPhone, and then ties it into the flip phone by calling - - using the same nickname. So I think that's all relevant, and there's no 403 danger.

The trial court found it "really interesting" that the images produced from the phones at the hearing were not procured during the execution of the search warrant but rather "were subsequently taken of the phones that the police still had in . . . their possession."

The trial court took part of the motion under advisement. Specifically, the trial court wanted to do further research on whether Investigator Pate's action of looking at the phone a second time, after the Cellebrite information was lost, was effectively a second search. The trial court determined that the "essence of what [wa]s being searched here [wa]s the electronic information stored on the phone, and that was information that had already been seen and was still in possession of the State, not just the phone, but the information on the phones." The trial court determined that there was "little difference in looking at a copy of . . . the electronic data on a phone from the Cellebrite software as actually looking at it on the phone itself if there [h]as been no additional information or

opportunity to put information on that phone." The trial court also determined that the text messages on the flip phone did not violate Tennessee Rule of Evidence 404(b) because they were "probative to the intent of [Defendant] to sell and deliver the substances that were allegedly found in his possession" and had a "high degree of relevance" based on the time period during which they were sent and or received by the flip phone. Additionally, the trial court determined the probative value outweighed the danger of unfair prejudice.

At the beginning of trial, Defendant pled guilty to simple possession of Xanax, simple possession of marijuana, driving on a revoked license, and speeding but did not waive his right to a jury trial with regard to those offenses. He pled not guilty to the remaining offenses.

At trial, Irene M. Bullard testified that she was 85 years old and had lived on Davida Road for "[f]orty-plus years." On June 6, 2016, she went "out to [her] mailbox to get [her] mail, and . . . [t]his vehicle came flying into [her] driveway." She thought the vehicle was going to hit her car and drive through her closed garage door, but the vehicle stopped. "Right on the heels of [the vehicle] the police pulled in." Ms. Bullard went inside and locked the door. When she looked out the window, "the policeman had this person in handcuffs in the vehicle." On cross-examination, Ms. Bullard explained that she still drove herself and that she only wore "readers" to improve her vision.

Sergeant Brian Bumpus of the Knoxville Police Department was working a "traffic calming assignment on Davida Road" on June 6. He was in a marked police cruiser and had pulled over several vehicles that day when he "made a traffic stop on a dark green SUV" that was traveling northbound "at a rate of speed that's significantly higher than the posted speed limit which was 25 miles per hour." According to radar, the vehicle was going 48 miles per hour. As the vehicle drove past the location where Sergeant Bumpus was parked, he "attempt[ed] a traffic stop for the speeding offense." Initially, the vehicle looked like it was going to slow down and turn onto Wilma Lane. However, the vehicle did not stop, continued north, "then pull[ed] into [Ms. Bullard's] driveway, and then turn[ed] immediately like a hard right, like they're blading the vehicle away from [Sergeant Bumpus]." Sergeant Bumpus thought that the person in the vehicle was about to run, so he exited his vehicle. Defendant got out of the SUV. Sergeant Bumpus commanded Defendant to get back into his vehicle by yelling at him. Defendant refused after "at least two or three verbal commands." As Defendant was "standing by the vehicle, his left hand - - at least a portion of his left arm [wa]s concealed by the vehicle." Sergeant Bumpus saw Defendant "reach into the car for something." Sergeant Bumpus "pulled [his] service weapon, pointed it at [Defendant], and directed him to get back in the vehicle." Defendant finally complied and got back into his vehicle.

At that point, Sergeant Bumpus holstered his weapon, got Defendant out of the car, and placed Defendant in handcuffs. Sergeant Bumpus did a "pat down" of Defendant to make sure that he did not have a weapon. Sergeant Bumpus "notice[d] that [Defendant's] kicking something under . . . the car." It appeared that he was "pushing something" with his right foot. Sergeant Bumpus discovered "a small [clear plastic] bag of marijuana underneath the car." The bag was slightly torn open because Defendant had kicked it.

Sergeant Bumpus turned Defendant toward the police cruiser and saw "another little plastic baggie that was - - it was white at the time, or appeared to have something white inside of it, f[a]ll from the left side of his shorts" and fall to the ground. Sergeant Bumpus did not think it was in Defendant's pocket but that it fell from his "groin area" out of the bottom of his shorts. Sergeant Bumpus "observed another baggie of something on the ground near the front of [the police cruiser]" about four or five feet away. This bag was later determined to contain heroin and crystal methamphetamine. There were approximately "22 hits" of heroin packaged in "small little aluminum foil squares."

Sergeant Bumpus called for back-up because he thought that he might need to search the vehicle and wanted someone to keep an eye on Defendant. Officer Danielle Wilson arrived on the scene to support Sergeant Bumpus. Investigator Pate and Lieutenant Dusty Lane also came to the scene because they "specialize[d] in dealing with those types of cases where somebody is manufacturing or selling narcotics . . . ."

Defendant told Sergeant Bumpus that the white bag contained Xanax. Defendant admitted that the marijuana and Xanax were his but denied that the third bag was his. Defendant claimed he "was there to meet . . . somebody else, and [the third bag] must have been his, and that the guy took off" when he saw the police lights. At some point during the encounter, Defendant admitted that he did not have a valid driver's license. Defendant had two cell phones in the vehicle.

The State introduced the videotape from the police cruiser into evidence. On the videotape, there are no other people visible other than Defendant and Sergeant Bumpus. As Sergeant Bumpus explained, "as [Defendant's] vehicle enter[ed] the driveway, the driveway's empty. There's no little baggie sitting there, and then as my car spins back around, his car passes that point in the driveway, and then you see that baggie appear on my videotape right there on the ground." Defendant's driver's side window was down, so Sergeant Bumpus believed Defendant "was trying to get rid of that stuff" even though he did not see Defendant actually throw anything out the window. Sergeant Bumpus admitted that he never saw Defendant in a position where he could have exerted control over the bag found in the driveway that contained the heroin and methamphetamine.

Sergeant Bumpus testified that the Xanax and marijuana were packaged for personal use but that the heroin and crystal methamphetamine were packed for resale in "corner baggies" and foil packets inside a sandwich bag. Sergeant Bumpus explained that the bag containing the methamphetamine and heroin was in "rough shape" so after it was seized he repackaged it prior to sending it to the Tennessee Bureau of Investigation for testing.

Donna Roach, with the Knoxville/Knox County Geographic Information Systems ("KGIS") testified that the location of the traffic stop was 572 feet from Wallace Memorial Child Care Center, based on the accuracy of the maps, which are "accurate for a foot for every 100 feet" or plus or minus ten feet per 1000 feet.

Investigator Pate testified at trial as an expert in drug investigations. He also responded to the scene of the arrest. He testified that the amount and the packaging of the heroin was consistent with what he had been trained to recognize as possession by a drug dealer who intended to sell the drugs, rather than possession by a user. Additionally, Investigator Pate determined that the amount of methamphetamine found at the scene was consistent with possession by a dealer rather than a user.

With regard to the two cell phones found at the scene, Investigator Pate explained that drug dealers often utilized two cell phones, a higher-end phone for personal use and a "burner" phone for drug transactions that could be discarded. Investigator Pate explained, "[o]ne phone, he would try to keep clean, as far as illegal activity. The other one, it really doesn't matter, because [he] can just throw it away if [he] ha[d] to, and they would conduct their illegal activity on it." Investigator Pate did not testify on direct examination about the contents of the cell phones recovered from the vehicle at the scene.

On cross-examination, counsel for Defendant asked Investigator Pate specifics about the text messages on the phones. Investigator Pate admitted that he did not find any specific references to heroin or methamphetamine on either phone. However, he testified that drug dealers often use slang terms to refer to drugs. He recalled a text message on the flip phone related to "poles." Investigator Pate explained that "poles" referred to Xanax and that Defendant admitted the Xanax found at the scene belonged to him. On redirect, the State introduced text messages received by the flip phone that appeared to request drugs. Investigator Pate explained that Defendant's full name did not appear anywhere on the flip phone. Investigator Pate explained that there were text messages addressed to "Rock," and "K Rock" on both the iPhone and the flip phone and that Defendant's online rap videos also referred to him in the same manner. Investigator Pate explained that the flip phone only contained messages from the past few days but that this was consistent with the manner in which flip phones were used. On redirect

examination, the State introduced the screen shots from the text messages found on both phones into evidence.

A TBI representative testified that the drugs recovered from the scene included the bag of marijuana weighing 1.47 grams, the bag of Xanax weighing .74 grams, the methamphetamine weighing 5.6 grams, and the bag containing 22 individually wrapped hits of heroin weighing approximately 3.24 grams (including the packaging). The heroin had a street value of $440 to $660.

Gary Lamb, a private investigator, testified on behalf of Defendant. He explained that he was familiar with the area near where Defendant was arrested because he had worked "[h]eroin conspiracy[y], drug dealing cases" in that area at hotels including the America Best, the Econo Lodge, the Super 8, and Motel 6. According to Mr. Lamb, the area near Defendant's arrest is "one of the more dense areas" of drug crime in Knoxville.

At the conclusion of the proof, the jury found Defendant guilty of possession of heroin with the intent to sell in a drug free zone. The jury assessed a $60,000 fine. The jury found Defendant guilty of possession of heroin with intent to deliver in a drug free zone, and affixed another $60,000 fine. The jury found Defendant guilty of both possession of methamphetamine with intent to sell and possession of methamphetamine with intent to deliver in a drug free zone. The jury affixed a $40,000 fine for each of these convictions. The jury found Defendant guilty of simple possession of both Alzapram and marijuana. The jury affixed a $1250 fine for each of these convictions. Defendant was found guilty of violating the driver's license law and speeding. For these convictions, the jury affixed fines of $250 and $50, respectively.

After a sentencing hearing, the trial court sentenced Defendant to twelve years and reduced the jury imposed fine to $2000 in fines for each conviction involving heroin. The trial court merged the conviction for possession of heroin within a drug free zone with intent to deliver, with the conviction for possession of heroin in a drug free zone with intent to sell. The trial court sentenced Defendant to ten years and reduced the jury imposed fine to $2000 for each conviction involving methamphetamine. The trial court merged the conviction for possession of methamphetamine in a drug free zone with intent to deliver with the conviction for possession of methamphetamine in a drug free zone with intent to sell.[3] Defendant was sentenced to eleven months and twenty-nine days for

---

[3] We note that the judgment form for the conviction for possession of methamphetamine in a drug free zone with intent to deliver (count 4), states the following in the "Special Conditions" box: "MERGES BY OPERATION OF LAW WITH COUNT 4." This is clearly a clerical error. On remand, the trial court should enter a new judgment form to correct the clerical error, reflecting that the conviction for possession of methamphetamine in a drug free zone

the conviction for simple possession of Alprazalam and the trial court assessed a $750 fine. For the conviction for simple possession of marijuana, Defendant was sentenced to eleven months and twenty-nine days and the trial court assessed a $250 fine. Defendant was sentenced to thirty days for the conviction for violation of the driver's license law and thirty days for the conviction for speeding. The trial court aligned all of the sentences concurrently with one another, for an effective sentence of twelve years, at one-hundred percent, as a Range II offender, and $5,000 in total fines.

In a timely motion for new trial, Defendant challenged several aspects of the trial, including the trial court's denial of the motion to suppress and the trial court's determination that the text messages on the cell phones were admissible. An amended motion for new trial claimed that the State did not authenticate the text messages. The trial court denied the motion for new trial. The notice of appeal was filed in September of 2018.

On February 1, 2019, counsel for Defendant filed a motion to abate ab initio based on Defendant's death on December 16, 2018. The State responded to the motion, arguing that Defendant's appeal should be dismissed but objecting to the request that the prosecution be abated ab initio. On September 18, 2019, this Court issued an order denying the motion to abate. Citing *State v. Al Mutory*, 581 S.W.3d 741 (Tenn. 2019), this Court cautioned counsel for Defendant and the State that unless one of the parties could "satisfactorily demonstrate to this court that this appeal shall continue in light of some viable interest, 'be it an interest of the defendant's family, the victim's family, or society,' this appeal will be dismissed." This Court ordered the parties to "file a response with appropriate reference to post-judgment facts in accordance with Rule 14." Counsel for Defendant filed a response asserting that the appeal should be allowed to proceed because there was a societal interest in resolution of an issue of first impression concerning the authentication and hearsay rules governing the admission of text messages from unknown sources and an interest of Defendant's family concerning the imposition of $3,000 in fines in this matter.[4] This Court determined that counsel for Defendant had established a sufficient basis to permit the appeal to proceed.

*Analysis*

---

(count 4) with intent to deliver merged with the conviction for possession of methamphetamine in a drug free zone with intent to sell (count 3).

[4] The judgments and the sentencing hearing transcript reflect total fines of $5,000. Nothing in the record indicates that efforts have been made to collect these fines from Defendant's family.

On appeal, Defendant argues: (1) that the "State failed to authenticate the text messages, rendering them inadmissible;" (2) that the text messages were hearsay and did not fit within any of the exceptions to Tennessee Rule of Evidence 803; and (3) that the trial court's improper admission of the text messages was harmful error. The State, on the other hand, argues that Defendant has waived any issue with regard to the authentication of the text messages because he has raised that issue for the first time on appeal. Moreover, the State argues Defendant was the first to introduce the contents of the text messages to the jury and that the State only introduced the text messages after cross-examination of Investigator Pate by counsel for Defendant. Finally, the State argues that Defendant is not entitled to plain error relief of this issue and that it is not a matter of first impression.

At the outset, we note that Defendant has raised the issue with regard to authentication of the text messages for the first time on appeal. Citing this as an issue of first impression in Tennessee, Defendant relies on cases from various jurisdictions to support his argument. Ordinarily, issues raised for the first time on appeal are waived. An appellate court will not consider an issue raised for the first time in the appellate court. *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); *See* Tenn. R. App. P. 36(a). Additionally, a defendant cannot litigate an issue in the trial court on one ground, abandon that ground, and assert a new basis or ground for his argument in this Court. *State v. Matthews*, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990); *State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988); *State v. Brock*, 678 S.W.2d 486, 489-90 (Tenn. Crim. App. 1984).

In the motion to suppress, Defendant objected to the introduction of the contents of the cell phones because they were unlawfully searched. At the hearing, however, Defendant argued that he did not own the flip phone, so anything on it was irrelevant and inadmissible hearsay. Immediately prior to trial, Defendant advanced yet another argument with regard to the admissibility of the text messages, arguing that the text messages on the flip phone should be excluded as evidence of bad acts. In our review of the record, we fail to find any argument by Defendant that the messages lacked authentication. This issue is waived.

Moreover, the State did not introduce the contents of the text messages until counsel for Defendant questioned Investigator Pate about the content of the messages found on the phone. Counsel for Defendant asked Investigator Pate if he saw "a single text with one of those – any of those street terms referring to heroin or meth in there?" Counsel also asked if there was a search warrant obtained to search the phones because officers "expect[ed] to find proof of drug sales in those phones." On redirect, the State admitted the text messages from both phones into evidence. By asking questions about the specific content of the messages, counsel for Defendant effectively opened the door to

allow the State to move for the admission of the text messages. *See* Tenn. R. App. P. 36(a); *see also* Tenn. R. App. P. 36, Advisory Comm'n Cmt. ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."). Defendant is not entitled to relief on this issue.

## *Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed and remanded. On remand, the trial court should enter a new judgment form to correct a clerical error to reflect that the conviction for possession of methamphetamine in a drug free zone with intent to deliver (count 4) merged with the conviction for possession of methamphetamine in a drug free zone with intent to sell (count 3).
.

_____
TIMOTHY L. EASTER, JUDGE

- 12 -