IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 29, 2020 Session

**LAVAN TREMAYNE JOHNSON, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 115614   Bobby R. McGee, Judge**
_____

**No. E2019-02259-CCA-R3-PC**
_____

The Petitioner, Lavan Tremayne Johnson, Jr., filed for post-conviction relief, alleging that his counsel were ineffective and that his guilty pleas were not knowingly and voluntarily entered.  The post-conviction court denied relief, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Liddell Kirk (at hearing), Gregory P. Isaacs and J. Franklin Ammons (on appeal), Knoxville, Tennessee, for the Appellant, Lavan Tremayne Johnson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

After facing multiple indictments which charged him with eleven offenses and gang enhancements, the Petitioner agreed to plead guilty to especially aggravated kidnapping and received a sentence of fifteen years, one hundred percent of which he was to serve in confinement.  He also pled guilty to possession of fentanyl, a schedule II controlled substance, with the intent to manufacture and received a sentence of eight years; possession of a firearm during the commission of a dangerous felony and received a sentence of three years; possession of the schedule I controlled substance heroin with the intent to sell,

deliver, or manufacture and received a sentence of twelve years; and aggravated assault and received a sentence of three years. The total effective sentence was "30 years to serve with the first 15 at 100 percent and the last 15 at 30 percent." The remaining counts of the indictments were dismissed pursuant to the plea agreement.

Upon questioning by the trial court at the guilty plea hearing, the Petitioner said that he had not taken any medications or drugs that might affect or impair his judgment or his ability to understand the proceedings. The Petitioner agreed that his understanding of the plea agreement was that he would be sentenced to thirty years and that he would be required to serve one hundred percent of the first fifteen years and thirty percent of the remaining fifteen years in confinement. The Petitioner acknowledged that he understood the convictions could be used to enhance any future sentences. The Petitioner agreed that he reviewed the plea agreement with his attorneys and that he signed the written plea agreement. The trial court reviewed the rights the Petitioner was forfeiting by entering his guilty pleas, and the Petitioner said that he understood. The Petitioner affirmed that he was entering his guilty pleas "freely and voluntarily and knowingly" and that no one had threatened him or promised him anything to convince him to plead guilty. The Petitioner agreed that he was satisfied with the representation of his attorneys.

As a factual basis for the pleas, the State stated that at approximately 8:30 a.m. on February 17, 2018, the Petitioner and co-defendant Darius Patterson tied up Travis Clark with an electrical cord, the Petitioner pointed an assault rifle at Clark, and Patterson put a Glock pistol in Clark's mouth and threatened to kill Clark because of property Clark had allegedly stolen. Eventually, Clark escaped by jumping through a bedroom window. Four days later, the police arrested the Petitioner inside an apartment on Hall of Fame Drive. During a consensual search of the apartment, the police found drug paraphernalia consistent with the manufacture of heroin for distribution; a brown powder that tested positive for fentanyl, which the Knoxville Police Department knew was commonly mixed with heroin prior to distribution; a loaded .22 caliber handgun; .22 caliber ammunition; the Petitioner's clothing; and photographs of the Petitioner. The Petitioner acknowledged that the gun belonged to him. While the Petitioner was released on bond for the kidnapping and drug offenses, a witness told the police that the Petitioner had pointed a gun at his girlfriend, Jada Broadus. The Petitioner assaulted Broadus outside of an apartment complex, and the assault was captured on surveillance video. Thereafter, the Petitioner forced Broadus to leave the apartment complex and go to a different location. The police found the Petitioner and Broadus in a house and arrested him. The police obtained search warrants for the Petitioner's house and Broadus' cellular telephone. Inside the house, the police found a bag containing a bullet, but they did not find a gun. From information on Broadus' cellular telephone, the police were able to determine that the Petitioner and a woman by the name Melissa Davis were selling heroin and methamphetamine. After his arrest, the Petitioner told a drug enforcement officer about his narcotics sales.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, alleging that his counsel were ineffective by failing to (1) confer with the Petitioner, (2) fully discuss potential strategies and tactical choices with the Petitioner; (3) make any pretrial motions such as psychiatric examinations or suppression of evidence; (4) conduct appropriate investigations; (5) determine possible defenses; (6) interview witnesses; and (7) review discovery. An attorney was appointed to represent the Petitioner, and an amended post-conviction petition was filed alleging that the Petitioner's guilty pleas were not voluntarily or knowingly entered due to coercion by counsel. The petition alleged that counsel refused to investigate the cases and insisted the Petitioner accept the plea agreement. The Petitioner contended that if counsel had investigated the case, shared discovery with the Petitioner, and been willing to contest the charges at trial, the Petitioner would not have pled guilty and would have proceeded to trial.

The Petitioner testified at the post-conviction hearing that he initially faced a kidnapping charge and a drug charge, which were followed by an aggravated assault charge and another drug charge. The Petitioner's father hired counsel (hereinafter "first counsel") to represent the Petitioner at the preliminary hearing on the especially aggravated kidnapping of Clark and the initial drug charges (hereinafter "the first case"). While the Petitioner's case was pending in general sessions court, he was in custody, and he and first counsel discussed the Petitioner's version of events.

The Petitioner recalled that Clark had testified at the preliminary hearing that the Petitioner had taken Clark from his apartment to another location and that the Petitioner held an assault rifle on Clark and bound him with a cord. Clark was able to escape through a window. Clark had also testified that Patterson had threatened Clark with a Glock and that the Petitioner threatened Clark with an AR-15. The Petitioner discussed Clark's version of events with first counsel, including the Petitioner's understanding that Clark had said the Petitioner "just was standing there posing with a firearm, never said nothing or never did nothing to him." First counsel told the Petitioner that Clark had identified the Petitioner from a lineup and had identified the Petitioner and Patterson in court during the preliminary hearing.

The Petitioner said that he was at the apartment of his girlfriend's cousin when he was arrested for the especially aggravated kidnapping of Clark. The police found a substance they claimed was residue of a schedule II narcotic at the apartment, and they claimed the substance belonged to the Petitioner. The Petitioner denied ownership of the drugs. The police also recovered a handgun from the apartment, and the Petitioner acknowledged the gun belonged to him. The Petitioner discussed these matters with first counsel prior to the preliminary hearing.

The Petitioner said that he was released on bond on the kidnapping charge. He was charged later with the aggravated assault and especially aggravated kidnapping of his

girlfriend, Jada Broadus, and possession of a weapon (hereinafter "the second case"). The State alleged that the Petitioner held a firearm on Broadus inside an apartment and forced her to go outside. The Petitioner's uncle was supposed to hire first counsel to represent him on both cases, but the Petitioner thought his uncle and first counsel had a "disagreement." Nevertheless, first counsel represented the Petitioner at the preliminary hearing on the second case. Thereafter, first counsel continued to represent the Petitioner on the first case but was removed from the second case, and second counsel was appointed.

The Petitioner said that after second counsel was appointed, he learned that the police had interviewed Broadus. The Petitioner explained that he had given Broadus a cellular telephone so they could stay in communication. Broadus stopped answering his calls, and the Petitioner called his aunt. The Petitioner said that Broadus "was right there. She told me that the police had forced her to give them my phone and my password." The Petitioner said that he never learned whether the police obtained a warrant to search his cellular telephone.

The Petitioner said that after the preliminary hearing on the second case, he saw first counsel when his application for bond was rejected. The Petitioner said that Broadus did not testify at the second preliminary hearing but that her aunt testified. The Petitioner said that he spoke with Broadus prior to the preliminary hearing. She told him that "she wasn't coming and whatnot and the charges was bogus." The Petitioner gave Broadus second counsel's telephone number. She contacted second counsel and told him "she wanted to drop the charges." The Petitioner said that he had not talked with first counsel "since he came with this plea deal."

The Petitioner explained that the police obtained his cellular telephone from Broadus. They searched the telephone and charged him with an additional drug charge. Second counsel told the Petitioner that after the search, the police claimed the Petitioner was "gang affiliated and they had drug sales." Second counsel did not mention whether the police had obtained a warrant to search the telephone.

The Petitioner said that he talked to first counsel about the discovery in the first case. On one occasion, he went to first counsel's office to discuss a potential witness on the especially aggravated kidnapping charge. First counsel told the Petitioner that he had the discovery but that he needed to take his time and go through the discovery before giving the Petitioner a copy. However, first counsel never showed the Petitioner the discovery or reviewed the discovery with the Petitioner. The Petitioner said that the only evidence he saw on the first case was what he heard when he watched Patterson's trial.

The Petitioner said that on the first case, he and Patterson were scheduled to be tried on the same day; however, first counsel was granted a continuance for the Petitioner's trial.

The Petitioner said that he watched part of Patterson's trial because he knew "nothing about my case." Patterson was convicted and received a sentence of forty years.

The Petitioner said that after he was charged in the second case, first counsel "cuss[ed] me out, . . . and was saying that I caught another case. I'm stupid. And I should have called him before I caught another – called him before I caught another charge." First counsel told the Petitioner that he would not argue to keep the Petitioner on bond. The Petitioner said that first counsel's only concern was getting paid for representing the Petitioner on the first case.

The Petitioner said that he met with second counsel about the discovery in the second case. Second counsel told the Petitioner that the State had alleged a gang enhancement. The Petitioner asked second counsel if the Petitioner "needed copies of everything." Second counsel wrote approximately ten or fifteen names on a piece of paper and gave the paper to the Petitioner. Second counsel did not provide the Petitioner with copies of any discovery.

The Petitioner said that he was in custody at the penal farm when he met with second counsel. Second counsel told him that a surveillance video showed the Petitioner and Broadus fighting, and it showed the Petitioner choking Broadus. The Petitioner asked to see the video, but second counsel said that he could not show the Petitioner the video. The Petitioner asked second counsel to see everything the police retrieved from his cellular telephone. Second counsel responded that some of the material was "sexually graphic" and that he could not give the material to the Petitioner. The Petitioner asked what information was found on the cellular telephone, and second counsel said "text messages about drug sales," "[s]exual contact videos," and "gang language." The Petitioner wondered how the State was able to search his cellular telephone, but he did not ask second counsel about the search.

The Petitioner said that second counsel met with him once before second counsel and first counsel met with him regarding the plea agreement. The Petitioner said that he and first counsel did not discuss whether the Petitioner wanted to plead guilty or go to trial. The Petitioner urged second counsel to file a motion for speedy trial on the charges involving Broadus because she was his girlfriend and did not want to prosecute him. Second counsel did not "want to do a fast and speedy trial. He wanted to do it like a regular case." The Petitioner did not think second counsel ever filed a speedy trial motion.

The Petitioner said he told second counsel that if he had to enter a guilty plea, he would plead to the drug charge in the second case but that he did not want to plead guilty to every charge. Second counsel advised the Petitioner, "[I]f you plead to one, you got to plead to everything, 'cause it's going to be a global plea deal." Second counsel contacted

- 5 -

first counsel about the plea agreement. The Petitioner said that first counsel had pulled him aside at his bond hearing and that he had heard the Petitioner wanted a "plea deal."

The Petitioner said that he did not ask second counsel to file a motion to suppress. The Petitioner explained that he asked to see the discovery so he would know whether it could be suppressed.

The Petitioner said that he asked first counsel how he intended to defend the especially aggravated kidnapping case involving Clark. The Petitioner told first counsel to contact Desmond Rodda, who was in the house the day the Petitioner allegedly kidnapped Clark and could rebut the claim that the Petitioner forced Clark into the car. The Petitioner did not know whether first counsel ever contacted Rodda. The Petitioner explained that other than the times they were in court, the Petitioner did not see first counsel.

The Petitioner said that Clark left the apartment with him willingly and that he did not know where the allegations that he tied up and threatened Clark originated. The Petitioner told first counsel that he did not kidnap Clark and did not threaten him with a weapon. First counsel advised the Petitioner that he was not confident of the Petitioner's chances at trial, especially after Patterson was convicted. The Petitioner disputed first counsel's assessment, telling first counsel that Clark was a drug user and was not a credible witness. First counsel noted that a jury found Clark sufficiently credible to convict Patterson.

The Petitioner acknowledged telling second counsel that he assaulted Broadus, explaining, "We got into an altercation, but that's what people who go together do." The Petitioner maintained, however, that he did not have a weapon and that he did not threaten Broadus with a weapon. The Petitioner said that he asked to talk with drug enforcement officers and that during their conversations, he described some of the drug activity of which he was aware. When the Petitioner and first counsel discussed the Petitioner's arrest at the apartment of Broadus' cousin, the Petitioner told first counsel that the apartment was not his and that the drugs found in the apartment did not belong to him. The Petitioner said that he admitted to the police that the gun they found in the apartment belonged to him.

The Petitioner said that second counsel brought the proposed agreement to him. Second counsel said that he would try to get the Petitioner a "global plea deal of 20 years." First and second counsel visited the Petitioner together and asked if he had called anyone. The Petitioner responded that he had not spoken to anyone because he had "been in the hole for six months." First and second counsel told the Petitioner that the State had offered thirty years and that one hundred percent of the first fifteen years would have to be served in confinement. He would then be eligible for release after serving thirty percent of the remaining sentence in confinement. Second counsel advised the Petitioner that he would

be pleading guilty to "three charges . . . [d]rug charge, aggravated kidnapping, especially aggravated kidnapping charge and aggravated assault charge."

The Petitioner said that he thought he was pleading guilty to the drug charge which resulted from the search of his cellular telephone. The Petitioner said that he was willing to plead guilty to that drug charge but that he did not want to plead guilty to the charges related to the drugs found in the apartment.

The Petitioner maintained that he did not know that counsel were asking him to plead guilty to eight years on the fentanyl case. The Petitioner said that when he arrived at the penitentiary, he realized that he had pled guilty to five felonies. The Petitioner said that he thought he was pleading guilty to three felonies with two consecutive sentences.

The Petitioner acknowledged that he was shown a waiver of rights form that listed the offenses to which he was pleading guilty and that he signed it. The Petitioner asserted that he and counsel did not discuss all of the details of the plea agreement and that he asked for a copy of the plea agreement but that he did not obtain it until he was in prison. The Petitioner knew he would have to serve one hundred percent of the first fifteen years in confinement but was not aware that he was pleading guilty to a "weapon charge." He knew that he was receiving a three-year sentence for aggravated assault with a deadly weapon and did not know he was pleading guilty to possession of the gun that was found in the apartment.

The Petitioner said Broadus told him that she had informed second counsel that she wanted to get the charges against the Petitioner dropped. Second counsel told Broadus that he could not get the charges dismissed because "the State had picked it up." Second counsel told the Petitioner that Broadus had called him.

The Petitioner said that he initially was not interested in accepting the thirty-year plea agreement. Counsel cautioned the Petitioner that Patterson had been convicted, that the Petitioner did not want to get a sentence as long as Patterson, and that if he accepted the thirty-year plea agreement, he could be released from prison in approximately sixteen years. Counsel further advised the Petitioner that if he went to trial, he would receive a sentence of seventy-five to one hundred years.

The Petitioner said that he kept asking both first and second counsel for the discovery but never received it. The Petitioner said that first counsel advised the Petitioner that he thought the "trial was going to go bad and he really didn't have no strategy, because I had a witness testifying and he already got my co-defendant convicted." The Petitioner said counsel pressured him to accept the plea agreement and avoid the sentence that Patterson had received. The Petitioner said that he had never been in trouble and that he did not want a one-hundred-year sentence. However, he did not think he would have been

convicted of all the charges. Counsel advised the Petitioner that Patterson was sentenced to forty years at one hundred percent. Counsel told the Petitioner that he would be released sixteen years before Patterson.

The Petitioner said that after his guilty pleas, one of his attorneys brought him his final judgments. The Petitioner said, "[H]e just brought me the outlines. It didn't say nothing about nothing. It just said what they – the evidence that they had." Petitioner could not recall which attorney brought the judgments. The Petitioner said that he had been scheduled to go to trial on Monday, that counsel saw him on Tuesday regarding the plea agreement, that counsel had him sign the plea agreement on Thursday, and that the guilty plea hearing was on Friday. Counsel told him that if he did not sign the plea agreement, he would go to trial the following Monday.

The Petitioner said that one or two weeks after he pled guilty, he wrote counsel asking for "a copy of all my charges and what I pleaded to." Approximately three weeks after the Petitioner was sentenced, second counsel told the Petitioner that he and first counsel would bring the Petitioner "all [his] information." The Petitioner said that counsel brought him his "discovery response," but it included only his final judgment and did not include any evidence. The Petitioner said, "It just had little categories on video, video and saying what evidence they had."

The Petitioner said that when counsel came to see him two weeks after his guilty pleas and showed him his final judgments, "[i]t was three charges on there." Thereafter, the Petitioner obtained his "time sheet" and learned that he had pled guilty to five charges and received three consecutive sentences when he thought he had pled guilty to three charges and received two consecutive sentences. The Petitioner said that counsel also had advised him that his court costs and fees were going to be waived but that they were not waived.

The Petitioner said that he did not accept the plea offer because of the assurance that the fees and fines would be waived. Instead, his "main" reason was that he did not want to receive the same sentence as Patterson. The Petitioner noted that Clark had said that Patterson "did something to him," so the Petitioner thought he could have been found not guilty even though Patterson had been found guilty. The Petitioner then said that Patterson's being convicted and receiving a lengthy sentence "didn't have a big impact on [him] one way or the other."

On cross-examination, the Petitioner acknowledged that on January 20, 2017, he was charged in Saint Clair Shores with shooting at his pregnant girlfriend; that in April 2017, he pled guilty to carrying a concealed weapon, malicious destruction of property over $1,000, and reckless use of a firearm; and that he received a probationary sentence of eighteen months. Thereafter, in February 2018, the Appellant and Patterson were charged

with the especially aggravated kidnapping of Clark. Upon his arrest, the Appellant was charged with possessing fentanyl with the intent to sell and possession of a firearm during the commission of a dangerous felony.

The Petitioner acknowledged that in November 2018, the State attempted to revoke his bond after he missed a couple of court dates. The Petitioner conceded that first counsel persuaded the trial court not to issue a warrant for the Petitioner's arrest and convinced the Petitioner to come to court.

First counsel testified that he represented the Petitioner on the especially aggravated kidnapping, the charges related to the drugs taken from the apartment, and possession of a weapon. First counsel represented the Petitioner at the preliminary hearing. First counsel said that they received the discovery when the case got to criminal court. First counsel found nothing exculpatory in the discovery. First counsel said that he spoke with Clark outside the courtroom at the preliminary hearing and that he also spoke with Clark's girlfriend, who testified at the hearing that "[t]he kids were present and that they were all threatened."

First counsel recalled that Clark claimed someone held "an AK-type weapon on him – assault weapon on him and drove all through the town during the daylight hours and no one called the police." First counsel thought Clark's version of events seemed "odd." First counsel said that he and the Petitioner discussed the events at the house "when they arrived and whether or not that would necessarily be held against him under all those circumstances." First counsel did not recall the Petitioner ever suggesting the names of witnesses who should be interviewed. First counsel thought he made it clear to the Petitioner that, based upon Clark's testimony, the case would be difficult.

First counsel said that he knew the State had recovered a handgun and schedule II narcotics inside the apartment where they arrested the Petitioner. First counsel thought the drugs were found in a small suitcase that belonged to the Petitioner. First counsel and the Petitioner discussed whether any basis existed to suppress the items found in the apartment, but first counsel did not think the evidence could be suppressed.

First counsel said that the defense theory of the case

> was the same from the beginning, which was that – that he was – he knew Clark and that he was hanging out out there and that Patterson called him and said to bring him over to the house. He wanted to talk to him. And so that he was just giving him a ride and that the story of being held at gunpoint across town was just made up later. And that what happened in the house

- 9 -

was between Patterson and Clark. The Petitioner said that Clark went with him voluntarily to the other location.

First counsel acknowledged that the Petitioner asked to see the discovery. First counsel could not recall whether he had the discovery the first time the Petitioner asked to see it, but he recalled giving the Petitioner a copy of the discovery inside a yellow envelope or envelopes. First counsel told the Petitioner not to lose the discovery because he would not make the Petitioner another copy. He also cautioned the Petitioner not to let anyone else see the discovery. First counsel gave the Petitioner the discovery before he was released on bond. First counsel did not recall the Petitioner coming to his office after the Petitioner was released on bond.

First counsel said that he told the Petitioner, the Petitioner's father, and Broadus that the Petitioner should not be released on bond. He explained that the Petitioner was young and that he would likely commit more offenses. First counsel's fears were proven true after the Petitioner was released on bond, and he was charged with the especially aggravated kidnapping of Broadus, the aggravated assault of Broadus, and use of a weapon. First counsel said that he represented the Petitioner at the preliminary hearing on those charges even though he had not been retained. First counsel told the Petitioner that he would not represent him in criminal court on the new charges, and second counsel was appointed.

First counsel said that not much time elapsed between the first case and the second case; therefore, he had not had time to resolve first case before the Petitioner was indicted on the second case. First counsel said that he never received the surveillance video showing the aggravated assault but that he heard about the video. First counsel said that he did not receive the discovery related to the Petitioner's cellular telephone.

First counsel said that he and the prosecutor were often unable to resolve serious drug cases by plea negotiations. The prosecutor informed first counsel "that whatever offer she made [the Petitioner] wasn't going to like and that he probably wasn't going to accept." The prosecutor refused to offer a probationary sentence to the Petitioner.

First counsel said that the Petitioner and Patterson both made statements to the police. First counsel filed a motion to sever their trials because of a <u>Bruton</u> problem.[1] After the motion was granted, the Petitioner decided to watch Patterson's trial. During Patterson's trial, the Petitioner called first counsel at his office, concerned because most of

---

[1]In <u>Bruton v. United States</u>, 391 U.S. 123, 126 (1968), the United States Supreme Court held that allowing into evidence a codefendant's statement that implicated the defendant when the codefendant did not testify violated the defendant's right to confrontation.

the proof implicated the Petitioner. First counsel reminded the Petitioner that he had warned the Petitioner that would happen and that if they proceeded to trial, they would blame the events on Patterson. Later in the trial, the Petitioner called a second time, again upset that he was being talked about during Patterson's trial.

First counsel said that he did not hear from the Petitioner again until sometime in April 2019, which was after Patterson was sentenced and the Petitioner was back in jail. The Petitioner wanted to talk "about a resolution." The Petitioner was concerned about the length of Patterson's sentence and stated that he was willing to accept a sentence of twenty-seven years. First counsel asked the Petitioner if he had been having telephone conversations with anyone, which the Petitioner denied. First counsel said that the prosecutor had offered a sentence of thirty years. First counsel told the prosecutor the Petitioner would not accept thirty years. First counsel said that he knew the Petitioner had called someone even though the Petitioner denied it. First counsel said that after Patterson was sentenced, he had additional plea negotiations with the State. First counsel said that "[p]robation was never on the table" and that the Petitioner faced "three separate mandatory stacks." First counsel said that the charges the Petitioner received while he was released on bond would have to be served consecutively to any sentences he received for the especially aggravated kidnapping of Clark.

First counsel said that he did not know whether second counsel had any formal plea negotiations with the State. First counsel said that when he mentioned the conversation to second counsel, second counsel said that he had the same conversation with the Petitioner. First and second counsel met with the Petitioner and talked about what they could reasonably expect from plea negotiations. First and second counsel then negotiated with the State. First counsel told the Petitioner the terms of the agreement and advised him "that was as good as it was going to get." The Petitioner wanted "a better deal," but first counsel told him he could not get a better deal. First counsel explained to the Petitioner that the plea offer required him to plead guilty to five felonies, not three.

First counsel said that the Petitioner was not happy with the terms of the plea agreement, which first counsel understood because the Petitioner was only twenty years old. First counsel said that he did not recall telling the Petitioner that he could have been sentenced to seventy-five or one hundred years. First counsel told the Petitioner "that he was in a – in a deep hole and that if we went to trial and lost, he was going to wish he had Mr. Patterson's sentence." First counsel said that he was aware of one prior conviction the Petitioner had; accordingly, the Petitioner was a standard, Range I offender. Further, the plea agreement provided that the Petitioner would be sentenced as a standard, Range I offender.

First counsel said that when he conducted the preliminary hearing regarding the especially aggravated kidnapping of Broadus, the Petitioner insisted that first counsel ask

Broadus' aunt "about whether or not they'd ever had any other trouble." The aunt asked if first counsel was sure he wanted to ask that question. The Petitioner told first counsel to proceed. The aunt "just went out to spew all the other things she said he – he did to her niece and that she witnessed, and that she loved him, but he was doing the stuff anyway." First counsel cautioned the Petitioner that Broadus' aunt was not a favorable witness. First counsel stated, however, that the Petitioner "is young, but he understands what he wants to understand. And that's what I was trying to dissuade him from, was this woman is not going to help you in the future."

First counsel said that he did not review the discovery in the second case but that he discussed the evidence with second counsel. First counsel asserted that his advice to the Petitioner regarding the strength of the State's case was based upon the evidence in the original kidnapping, drug, and weapon charges. First counsel said that the Petitioner was "pretty upset" about what transpired during Patterson's trial and, thereafter, became "extremely interested" in pleading guilty. First counsel cautioned the Petitioner that he might have two or more trials to resolve all of his cases. First counsel was willing to take the case to trial even though he would not necessarily have advised the Petitioner to proceed to trial. First counsel said that he was not upset because he did not get paid.

First counsel opined that the Petitioner decided to plead guilty because he knew the sentence he could receive if he were convicted of all the charges at trial. First counsel said after watching Patterson's trial, the Petitioner was aware that he could be convicted of all the charges. First counsel thought that while the plea offer was not "nice," it was better than the sentence the Petitioner would receive if he were convicted at trial.

Second counsel testified that he was appointed to represent the Petitioner. First counsel represented the Petitioner at the preliminary hearing on the aggravated assault and especially aggravated kidnapping case regarding Clark. Second counsel attended the preliminary hearing on the drug charges, but he had not yet started representing the Petitioner.

Second counsel said that he spoke with Broadus twice. He first spoke with her on March 5, 2019, the day he was appointed to represent the Petitioner. The Petitioner's and Broadus' sole concern was filing a bond motion. Second counsel spoke with Broadus again by telephone regarding the bond issue. Broadus told second counsel that she did not want to prosecute the case, and he told her to call the district attorney's office and ask them to "drop[] the case." Second counsel said that Broadus' aunt witnessed the incident between Broadus and the Petitioner. Second counsel was not able to interview Broadus' aunt. Second counsel focused solely on the drug charges because the aggravated assault case "had not come out."

Second counsel said that on March 30, he received a letter from the Petitioner stating that he did not want to proceed to trial and wanted second counsel to try to resolve the case. Second counsel was appointed to represent the Petitioner on the aggravated assault case after Patterson was convicted.

Second counsel said that he hired Gary Lamb to help investigate the drug charges. Second counsel received the discovery, and he and Lamb reviewed the "cell phone dump." Second counsel discussed the "printed discovery" and the contents from the cellular telephone with the Petitioner. Second counsel knew the police had obtained the Petitioner's cellular telephone from Broadus. Second counsel did not recall whether the police had a search warrant for the cellular telephone. When asked if he and the Petitioner discussed whether a basis existed to suppress the evidence from the cellular telephone, second counsel said, "[T]hese things happened really quickly, within a period of about 30 days, so we hadn't quite gotten to that part." The discussions he had with the Petitioner primarily concerned the contents of the cellular telephone.

Second counsel said that while the Petitioner was represented by first counsel, the Petitioner spoke with a drug enforcement officer about his drug activity and that the police had a video of the interview. Second counsel stated that the Petitioner did not ask to see the information from the cellular telephone until after he had pled guilty. However, they had discussed the information prior to the guilty pleas. Second counsel said they were "in the early stages" of the case when the Petitioner decided he wanted second counsel to attempt to negotiate with the State.

Second counsel said that he did not see any exculpatory evidence in the discovery. After he saw the surveillance video from outside Broadus' residence, he realized the aggravated assault case was not as favorable for the Petitioner as he had thought after the preliminary hearing. Second counsel discussed the video with the Petitioner; however, second counsel was "well into the [plea] negotiations."

Second counsel said that he received the surveillance video on April 8, 2019, and that the Petitioner pled guilty on April 11, 2019. Second counsel said that he and first counsel kept their cases separate except for "light conversation," and each had "informal conversations" with the State about possible guilty pleas. After Patterson was sentenced, second and first counsel "joined forces" and met with the prosecutor. On one occasion, first counsel met with the Petitioner, and on two occasions, second and first counsel met with the Petitioner at the detention facility. During the second meeting, first and second counsel advised the Petitioner of the State's offer of thirty years. Second counsel said that he explained to the Petitioner that in order to get a thirty-year sentence, he had to plead guilty to five felonies.

- 13 -

Second counsel said that first counsel never told the Petitioner that he would receive a sentence of seventy-five or one hundred years. Instead, second and first counsel advised the Petitioner that Patterson had received a sentence of forty years and that if the Petitioner received a forty-year sentence in addition to one mandatory consecutive sentence, the Petitioner's total effective sentence could be considerably longer than Patterson's. Second counsel recalled that the Petitioner was "not happy" with the offer of thirty years and wanted counsel to get the sentence closer to twenty-seven years.

Second counsel said that he and the Petitioner discussed the potential defenses for the aggravated assault and especially aggravated kidnapping case involving Broadus. Second counsel said that they were still investigating the drug cases at the time of the guilty plea but that the State had "some unfortunate inculpatory evidence" against the Petitioner.

Second counsel said that he reviewed all the "printed discovery" with the Petitioner. He did not provide the Petitioner with a copy of discovery but offered to make a copy if the Petitioner wished. The Petitioner, however, "was actually more interested in the video discovery" pertaining to the aggravated assault charge. The Petitioner did not get a chance to see the video before he entered his guilty pleas, but second counsel advised the Petitioner of the contents of the video. Second counsel stated, "I had about 22 days to work on this case with Mr. Lamb before [the Petitioner] began indicating that he wanted this resolved at all costs."

Second counsel said that the Petitioner never asked him to file a motion for speedy trial, but he remembered having conversations with the Petitioner about a Giglio motion.[2] Second counsel did not recall the Petitioner asking him to do anything he had not done except send copies of DVDs of the cellular telephone information to him at the Tennessee Department of Correction. Second counsel explained that the Petitioner was not allowed to have DVDs while incarcerated and that some of the material on the cellular telephone was "sexually graphic and was "deemed inappropriate for an inmate to possess." Second counsel said that he and Lamb were able to view the information from the cellular telephone but that they had difficulties printing the information.

Second counsel did not know why the Petitioner decided to accept the thirty-year sentence. Second counsel stated that the Petitioner discussed the proposed agreement with

_____

[2] In Christopher A. Howard v. State, No. W2017-01890-CCA-R3-PC, 2018 WL 3996874, at *2 (Tenn. Crim. App. at Jackson, Aug. 21, 2018), this court explained:

> In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court held that the government must disclose promises made to witnesses that they would not be prosecuted in exchange for their cooperation with the government. Id. at 154. The court further found that non-disclosure of such promises equated to a violation of due process. Id.

- 14 -

his father and Patterson. Second counsel surmised that the Petitioner was displeased because he was young, he was facing a long sentence, and he was "overwhelmed." Second counsel said that the Petitioner signed the plea agreement the same night second and first counsel brought the agreement to the Petitioner.

The post-conviction court found that the Petitioner had "buyer's remorse" or "pleader's remorse." The post-conviction court noted that the Petitioner was a young man who had gotten himself into a lot of trouble. After the Petitioner saw his co-defendant receive a forty-year sentence, the Petitioner feared receiving a longer sentence if he went to trial. The post-conviction court stated that although the Petitioner's decision to plead guilty had been "tough," it did "not make his actions . . . involuntary." The post-conviction court found that counsel had given the Petitioner "excellent advice." The post-conviction court found that the Petitioner's decision to plead guilty was not coerced and was voluntary.

On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's

- 15 -

performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Further, in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); see also Hill v. Lockhart, 474 U.S. 52, 59 (1985).

When a defendant enters a plea of guilty, certain constitutional rights are waived, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Boykin v. Alabama, 395 U.S. 238, 243 (1969). Therefore, in order to comply with constitutional requirements a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). In order to ensure that a defendant understands the constitutional rights being relinquished, the trial court must advise the defendant of the consequences of a guilty plea, and determine whether the defendant understands those consequences. Boykin, 395 U.S. at 244.

In determining whether the Petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

- 16 -

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. at Knoxville, Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

On appeal, the Petitioner contends that his counsel were ineffective by failing to advise him of the potential sentencing exposure and failing to provide and review the discovery with him; therefore, his guilty pleas were not knowing and voluntary. The Petitioner contends that he was not advised of the appropriate sentencing range for each count to which he pled guilty. The Petitioner also maintains that his guilty pleas were not knowing and voluntary.

The Petitioner contends that he was reluctant to plead guilty and that counsel pressured him to accept the State's offer. The Petitioner said that counsel advised him that if he were convicted at trial, he would receive a sentence between seventy and one hundred years and that he would be required to serve one hundred percent of the sentence in confinement. The Petitioner maintains that his "plea waiver does not indicate that he was adequately advised regarding his potential sentencing exposure. . . . For each count that [the Petitioner] was to plead guilty to, the plea waiver indicates that [the Petitioner's] sentencing exposure spanned from a Range I offender to a career offender." In other words, the Petitioner contends that as a standard, Range I offender, he should have been advised only of the potential sentences for a standard, Range I offender.

In support of this contention, the Petitioner cites James M. Meese v. State, No. M2017-00909-CCA-R3-PC, 2018 WL 3154348 (Tenn. Crim. App. at Nashville, June 26, 2018). In Meese, the defendant argued that trial counsel "inflated his actual sentencing exposure by advising him that he could be sentenced as a Range III offender" instead of a Range I offender. Id. at *8. The defendant further argued "that trial counsel informed him he could go to prison for 75.5 years when his actual felony exposure was thirty-four years, plus three years for his misdemeanor crimes." Id. This court acknowledged that "counsel should explain the sentencing exposure attached to each option available to the defendant." Id. at *8. In James M. Meese, the defendant's trial counsel testified that he did not know the defendant's prior criminal history and therefore advised the Petitioner of the sentences for Range I, II, and III offenders. Id. at *9. This court noted that the defendant had no prior felony convictions and was thus a Range I offender. Id. at *10. This court stated that a defendant entering "a guilty plea should be advised regarding the maximum sentence he could receive were he to insist on going to trial with reference to his offender classification and not advised of the hypothetical sentence that some other offender with a more extensive criminal history could receive." Id. Accordingly, this court held that trial counsel's advice was deficient. Id. This court further held that trial counsel's advice was prejudicial, noting

- 17 -

that the defendant testified that he would not have pled guilty had he known the actual sentences he faced if convicted at trial instead of incorrectly being advised that he faced life in prison. Id. at *12. This court concluded that the defendant "established a reasonable probability that, but for the inflated sentencing exposure, the [defendant] would not have pled guilty." Id.

In the instant case, the Petitioner raised the issue that he was incorrectly advised of his sentencing range for the first time on appeal. Generally, we will not address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995); Demario Lawon Fisher v. State, No. M2018-00131-CCA-R3-PC, 2019 WL 1504391, at *9 (Tenn. Crim. App. at Nashville, Apr. 5, 2019). Regardless, no evidence was presented to show that counsel's advice to the Petitioner was inaccurate. Notably, first counsel testified that the Petitioner was a Range I offender. Further, both counsel testified that the co-defendant Patterson received a forty-year sentence and that the Petitioner faced additional charges which required consecutive sentencing, thus, subjecting him to a lengthier sentence. See Fisher, No. M2018-00131-CCA-R3-PC, 2019 WL 1504391, at *9. The Petitioner's exposure as a Range II, Range III, or career offender could have resulted in an even longer sentence. Accordingly, the Petitioner adduced no proof that counsel's advice regarding his potential sentencing exposure was inappropriate or incorrect.

The Petitioner also contends that counsel failed to provide him with a copy of discovery and to review discovery with him. However, this allegation is belied by the testimony of counsel. Counsel asserted that they reviewed discovery with the Petitioner. The Petitioner did not allege how any additional discovery would have benefitted his case. The Petitioner has failed to prove that counsel was deficient. See Denver Joe McMath, Jr. v. State, No. M2017-02426-CCA-R3-PC, 2019 WL 2420559, at *6 (Tenn. Crim. App. at Nashville, June 10, 2019); Tracy Looney v. State, No. M2018-00214-CCA-R3-PC, 2019 WL 645208, at *9 (Tenn. Crim. App. at Nashville, Feb. 15, 2019).

Finally, having concluded that the Petitioner's counsel were not ineffective, we also conclude that the Petitioner's claims that ineffective assistance rendered his guilty pleas unknowing and involuntary are unavailing. Further, we note that at the guilty plea hearing, the Petitioner asserted that he understood his guilty pleas and that he was entering his guilty pleas knowingly and voluntarily.

> "[T]he representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). This is because "[s]olemn declarations in open court carry a strong

- 18 -

presumption of verity[.]" Id. at 74. Because such statements carry a strong presumption of truthfulness, a petitioner, in order to overcome this presumption, must present more than "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible." Id.

Marcus Ward Strong v. State, No. E2018-00286-CCA-R3-PC, 2019 WL 2371946, at *16 (Tenn. Crim. App. at Knoxville, June 5, 2019). The post-conviction court concluded that the Petitioner's guilty pleas were knowingly and voluntarily entered. We agree.

### III. Conclusion

In sum, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE